**ROERICH v. HELVERING, Com'r of Internal Revenue.**

No. 7578.

United States Court of Appeals for the District of Columbia.

Argued June 14, 1940.

Decided Sept. 3, 1940.

Charles B. McInnis, of Washington, D. C., and John H. Jackson, of New York City, for petitioner.

J. P. Wenchel and Robt. L. Williams, both of the Bureau of Internal Revenue, and Samuel O. Clark, Jr., John J. Pringle, Sewall Key, and Lee A. Jackson, all of the Department of Justice, all of Washington, D. C., for respondent.

Before GRONER, Chief Justice, and EDGERTON and VINSON, Associate Justices.

EDGERTON, Associate Justice.

The petitioner, Roerich, asks review[1] of a decision of the Board of Tax Appeals that he is liable for certain income taxes. The principal questions relate to sums of $73,300 and $74,271.78 which he received in 1926 and 1927. He contends that they were contributions made to him as agent or trustee, to meet the expense of an Asiatic expedition. The Commissioner and the Board found that they were income which he derived from the sale of his paintings to one Horch.

Roerich, a nonresident alien, has been an artist, scientist and writer, and a leader of a mystic cult. He came to the United States in 1920. With friends and followers, including chiefly Horch, he later organized in New York three corporations concerned with artistic instruction, exhibition, or sales; Corona Mundi, Inc., Master Institute of United Arts, Inc., and Roerich Museum, Inc. The Museum was organized to acquire and exhibit his paintings and art objects. The same group organized an expedition to Asia, led by Roerich, which be-

---

1 Under Sections 1001–1003 of the Revenue Act of 1926, 44 Stat. 109, as amended by Section 1101 of the Revenue Act of 1932, 47 Stat. 286 and Section 519 of the Revenue Act of 1934, 48 Stat. 760, 26 U.S.C.A. Int.Rev.Acts, pages 311–313.

gan in 1923 and ended in 1928. Its purposes were scientific and artistic. One purpose among a number of others was to enable Roerich to paint pictures of the East. Almost all the money for the expedition came from Horch.

On April 30, 1923, before starting on the expedition, Roerich executed to Horch general powers of attorney which authorized him to represent Roerich in all matters and, specifically, to sell such of Roerich's paintings at such prices and on such terms as Horch might deem advisable. The next day Roerich executed an agreement with the Institute and with Corona giving them "the exclusive right to purchase all the artistic results of the Expedition, such as my paintings, drawings and sketches, as well as such paintings as I may complete thereafter. The price of these paintings may be established by mutual agreement and may be determined according to the present prices of my paintings. The paintings may be purchased either in series or individually, as may be determined in each case. This offer is accepted by me in view of the wish expressed by the Directors of the above-mentioned Institutions to found in the future a Museum in which my paintings will be permanently preserved."

Horch maintained an account for Roerich at a New York bank, and sent him statements of receipts and disbursements. Between 1923 and 1929 Roerich sent to New York from Asia some 400 paintings, including 189 in 1925-1927. Itemized lists, with valuations, accompanied them. In October, 1926, Horch deposited $73,300 in Roerich's account and cabled Roerich "Loan exhibition made permanent" by Horch. He later sent Roerich a financial statement in which the words "Making permanent Loan Exhibition, L. L. Horch, N. S. Horch" were written opposite the $73,-300 item. Horch testified that this meant that he bought a certain series of paintings, and that the price was fixed in a letter from Roerich which he no longer had; that he bought the pictures to be exhibited permanently at the Roerich Museum, Inc., all the shares of which he owned. His statement to Roerich for 1927 includes the following deposits by Horch in Roerich's account: "Permanent making remaining pictures" (sic), $25,000; "Payment Mongolian Paintings," $20,000 and $19,421; "Payment balance due on Finnish Paintings,"

$716.66; and "Deposited $9134.12 worth of Bonds still due on paintings, Mongolian series." These 1927 items total $74,271.78. On November 27, 1927, Horch cabled Roerich: "all remaining pictures have been made permanent by" Horch and his wife. Horch testified that all these payments represented purchases of Roerich's paintings. The paintings were all hung in the Museum.

In 1928 Roerich signed the following letter to Horch: "I herewith confirm that all my paintings and drawings from Finland, as well as all paintings of mine, during the years from 1924 to 1928, including the paintings sent from Darjeeling, from Kashmir and from Urga, and cited in the catalogue of the Roerich Museum, were sold to you." Roerich testified that he signed this letter on the oral representation of an agent of Horch that the letter was "for technical reasons" and "a pure formality." Horch's agent confirmed this and testified that she explained to Roerich that the "technical reasons" pertained to "the building occupied by the Roerich Museum." Roerich testified that he did not sell the paintings, but that they became the property of the Museum by an agreement between him and it that it should receive the fruits of the expedition, including paintings. This alleged agreement was not put in evidence, and no definite form or date was attributed to it. Roerich testified that Horch donated the sums in question for the purposes of the expedition. But Roerich conceded that in 1926 he sold certain paintings to persons other than Horch. These paintings were among the "fruits of the expedition."

These other sales, Roerich's prior agreement to sell expedition paintings to the Institute and Corona, his prior authority to Horch to sell his paintings, and his 1928 confirmation of sales of expedition paintings to Horch, contradict Roerich's present contention that no expedition paintings were ever his property and that all of them, including those here in issue, belonged to the Museum as soon as they were produced. We think the Board's finding that the disputed transactions in 1926 and 1927 were sales to Horch is supported by substantial evidence. It is therefore not subject to review.[2]

Roerich urges that Horch, as Roerich's agent, was disqualified from sell-

---

[2] Helvering v. National Grocery Company, 304 U.S. 282, 58 S.Ct. 932, 82 L. Ed. 1346, rehearing denied, 305 U.S. 669, 59 S.Ct. 56, 83 L.Ed. 434; Colorado National Bank v. Commissioner, 305 U.S. 23, 59 S.Ct. 48, 83 L.Ed. 20.

ing Roerich's pictures to Horch. But Roerich was not disqualified from selling his own pictures to Horch, and Horch violated no duty in buying his principal's property if the principal negotiated or ratified the sales with knowledge of the material facts. There is substantial evidence, including Roerich's signed statement of 1928, that he negotiated or ratified the sales to Horch. It is possible that, as Roerich in effect contends, his intention in signing that statement was to misrepresent the facts in order to perpetrate a fraud on creditors of the Museum; but in the light of the other evidence, the Board might reasonably believe that his signed statement was true in respect to the paintings here in issue. His counsel refer to "the alleged ratification of 1928" and urge that (1) it could not retroactively create tax liabilities for 1926 and 1927, and (2) it could not be valid, because Horch failed to disclose to Roerich that he had not reported the sales as income for those years. This assumes that Roerich's 1928 letter was an attempted ratification of previously invalid sales. It was, on the contrary, an admission that valid sales, duly authorized or ratified, had previously occurred. Sales to Horch created no greater tax liability than sales to a third person would have created; and Roerich does not contend that the sales were in other respects unfair, or that he was ignorant of other facts which would have affected his willingness to sell.

Even if the principle of Decatur Water Supply Co. v. Commissioner, 7 Cir., 88 F. 2d 341, were extended to hold that money received by a person under a moral obligation to use it for artistic purposes is not income, it would not aid Roerich. It appears that Roerich used the disputed sums to defray expedition expenses but it is not found, or conclusively shown, that he was in any way obligated to do so. His contention that these sums, if income, were "compensation for labor or personal services performed without the United States" by a nonresident alien, and were therefore exempt from tax, assumes that he did not, as the Board found that he did, own and sell the pictures, but was hired to paint them for the Museum.

■ Petitioner argues that he should not be taxed on the entire income derived from his pictures, because it was only partly from sources within the United States; also that he should be allowed deductions on account of the cost of producing the pictures. As these contentions were not made before the Board but are raised for the first time on this appeal, we do not consider them. The record contains no evidence concerning the cost of producing the pictures, though there is evidence of the cost of the entire expedition which had the production of pictures as one of its several purposes.

■ The Board found that the petitioner's failure to file a return for 1934 was due to fraud with intent to evade tax, and assessed a 50 per cent penalty on the amount due, pursuant to Section 293(b) of the Revenue Act of 1934, 26 U.S.C.A. Int. Rev.Code, § 293(b). From April, 1934, to January, 1936, he was absent from this country on a second Asiatic expedition. Horch, under his power of attorney, had filed income tax returns for him in 1930, 1931, 1932, and 1933. In March, 1935, Horch filed a "tentative return" for 1934, which contained the words "Estimated no tax" and showed no income except one item of interest. On August 7, 1935, Horch wrote to petitioner: "To my Letter in which I requested Information in regard to the Income which you earned in 1934 no Reply has been received by me. This Information was needed for your Income Tax Return for the American Government.' You know how strict the American Government is, but this of course is entirely your affair." Petitioner testified that the arrangement with Horch as to filing returns was still in existence in 1935, and that in reply to an inquiry from Horch in 1935 he wrote that "there was no income other than what he already knew." Horch testified that in 1934, before petitioner left New York, Horch asked him if he wished Horch to take care of income tax returns, and petitioner said he would write Horch "all the details of what to do" and give him instructions about it. Horch continued, "I did not know what the man did. The proceeds of sales of paintings which were received and deposited by me were only a part of petitioner's income . . . I had to follow his instructions . . ." The record shows that in the spring or summer of 1935 petitioner and Horch fell out. On the conflicting evidence, the Board might have found either that Horch had all the facts and the authority necessary to enable him to file a return and that petitioner relied on him to do so, or that petitioner knew that Horch could not or would not file a return. The finding of fraud based on the latter view was supported by evidence and must be sustained.

Affirmed.