ROBERT M. BRITTINGHAM, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6626-71, 6627-71, 6631-71, 7774-71, 7810-71.    Filed June 3, 1976.

---

[1] Cases of the following petitioners are consolidated herewith: Dallas Ceramic Company, docket No. 6627-71; Jeanne G. Brittingham, docket No. 6631-71; Juan R. Brittingham, docket No. 7774-71; Roberta M. Brittingham, docket No. 7810-71.

*Ethan B. Stroud, Robert W. Ryan, Jr., L. Vance Stanton, Cameron Dee Sewell,* and *Michael D. Cropper,* for the petitioners.

*John B. Turner* and *John W. Dierker,* for the respondent.

SIMPSON, *Judge:* In his notices of deficiency, the Commissioner determined the following deficiencies in, and additions to, the petitioners' income tax:

| Petitioner | Year | Deficiency | Sec. 6653(b)[2] addition | Sec. 6651(a) addition |
|---|---|---|---|---|
| Robert M. Brittingham and Jeanne G. Brittingham[3] | 1963 | $854,814.71 | $427,407.36 | - - - |
| | 1964 | 760,754.31 | 380,377.16 | - - - |
| | 1965 | 739,626.48 | 369,813.24 | - - - |
| | 1966 | 685,911.03 | 342,955.52 | - - - |
| Dallas Ceramic Co. | 1963 | 392,080.75 | 196,040.38 | - - - |
| | 1964 | 346,842.59 | 173,421.30 | - - - |
| | 1965 | 369,259.17 | 184,629.59 | - - - |
| Juan R. Brittingham | 1963 | 2,180,403.87 | 1,090,279.52 | - - - |
| | 1964 | 1,433,215.49 | 716,607.75 | - - - |
| | 1965 | 1,138,884.01 | 569,442.01 | - - - |
| | 1966 | 864,952.67 | 432,476.34 | - - - |
| Roberta M. Brittingham | 1960 | 4,174.00 | - - - | $1,043.50 |
| | 1961 | 19,589.34 | - - - | 4,897.34 |
| | 1962 | 70,603.53 | - - - | 17,650.88 |
| | 1963 | 337,691.74 | - - - | 84,422.94 |
| | 1964 | 100,279.92 | - - - | 25,069.98 |
| | 1965 | 90,505.20 | - - - | 22,626.30 |
| | 1966 | 102,065.13 | - - - | 25,516.28 |

In an amendment to his answer in the case of Roberta M. Brittingham, the Commissioner redetermined the deficiencies in, and additions to, tax as follows:

| Year | Amended deficiency | Amended sec. 6651(a) addition |
|---|---|---|
| 1960 | $82,096.39 | $20,524.10 |
| 1961 | 96,972.60 | 24,243.15 |
| 1962 | 213,737.27 | 53,434.32 |
| 1963 | 563,734.34 | 140,933.59 |
| 1964 | 259,189.10 | 64,797.28 |
| 1965 | 187,168.32 | 46,792.08 |
| 1966 | 217,372.60 | 54,343.15 |

---

[2] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years at issue, unless otherwise indicated.

[3] Petitioners Robert M. and Jeanne G. Brittingham filed joint Federal income tax returns for the years at issue and received a joint notice of deficiency, but filed separate petitions herein.

Some of the issues have been settled and the issues remaining for decision are: (1) Whether the petitioner, Dallas Ceramic Co., and Ceramica Regiomontana, S.A., were "owned or controlled directly or indirectly by the same interests" within the meaning of section 482 and whether Dallas Ceramic Co. paid an arm's-length price for the ceramic tile it purchased from Ceramica Regiomontana, S.A.; (2) whether the fraud penalty is applicable with respect to Dallas Ceramic Co. during the years in issue; (3) whether Robert M. and Jeanne G. Brittingham received unreported taxable income as a result of certain checks issued by Dallas Ceramic Co. to Ceramica Regiomontana, S.A., and whether the fraud penalty is applicable to them for the years in issue; (4) whether Juan R. Brittingham received unreported taxable income as a result of certain checks issued by Dallas Ceramic Co. to Ceramica Regiomontana, S.A.; (5) whether Juan R. Brittingham filed true and accurate returns for the years in issue within the meaning of section 874(a); (6) whether Juan R. Brittingham received a constructive dividend as a result of the sale of property by Dallas Ceramic Co. to his son-in-law in 1963; (7) whether the fraud penalty is applicable to Juan R. Brittingham for the years in issue; and (8) whether Roberta M. Brittingham was a resident alien during the years 1960 through 1966, and whether her failure to file returns for such years was due to reasonable cause.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners Robert M. Brittingham and Jeanne G. Brittingham lived in Dallas, Tex., at the time of filing their petitions in this case. During the years 1963 through 1966, they were husband and wife and timely filed their joint Federal income tax returns with the District Director of Internal Revenue, Dallas, Tex. Robert M. Brittingham will sometimes be referred to as Robert.

The petitioner Juan R. Brittingham was a citizen and resident of the Republic of Mexico, whose address at the time of filing his petition herein was Monterrey, Mexico. He timely filed his Federal nonresident alien income tax returns for the years 1963 through 1966 with the Director of International Operations,

Washington, D.C. Juan R. Brittingham is the brother of Robert and will sometimes be referred to as Juan.

The petitioner Roberta M. Brittingham is a citizen of the Republic of Mexico, whose address at the time of filing her petition herein was Monterrey, Mexico. She filed no U.S. Federal income tax returns for the years 1960 through 1966. Roberta M. Brittingham is the mother of Robert and Juan and will sometimes be referred to as Roberta.

The petitioner Dallas Ceramic Co. (Dallas Ceramic) was incorporated in 1947 under the laws of Texas and had its principal place of business in Dallas, Tex., at the time of filing its petition herein. It filed its Federal corporate income tax returns for the years 1963 through 1965 with the District Director of Internal Revenue, Dallas, Tex.

*Description of Dallas Ceramic and the Tile Industry*

Upon its incorporation, the principal organizers of Dallas Ceramic were Robert, Juan, Richard Evans, and Jack E. Jenkins. Robert, together with his immediate family, and Juan, together with his immediate family, have each owned an equal amount of Dallas Ceramic's stock since its incorporation.

When it was first organized, Dallas Ceramic was engaged only in manufacturing ceramic wall and floor tile, which was sold through its own stores and through its distributors. However, it soon began buying tile and related products from other suppliers and selling the purchased products in addition to its own products. During the years 1963 through 1966, it had about 300 employees and had average annual sales of approximately $8 million. In volume of sales, it ranked approximately fifth among all companies manufacturing and selling ceramic tile in the United States during this period. Its products were sold nationwide except in the far eastern part of the United States and the Central Atlantic States.

The ceramic tile manufactured by Dallas Ceramic is used in residential and apartment bathrooms and kitchens, commercial buildings, hospitals, airports, schools, and hotels. The tile's brand name is Dal-Tile, and it is manufactured in many shapes and sizes and with various finishes. Such tile is produced in 31 bright colors, 29 crystalline colors, and 10 satin matte colors. The most widely used size of tile is a flat piece, $4\frac{1}{4}$ inches square ($4\frac{1}{4}$-inch tile), and there are eight of such pieces in a square foot of tile.

Ceramic tile is made by mixing a "body," consisting of talc and ball clays, and pressing it into different shapes. In a separate procedure, a glaze is made by mixing seven or eight raw materials, melting the mixture, and adding water and a stain. This glaze is sprayed on the pressed tile, which is then put into a kiln and fired at a peak temperature of about 2,000 degrees Fahrenheit. Finally, the completed tile product is allowed to cool and is ready to be sorted and packed.

Dallas Ceramic has employees known as sorters, who grade the finished tile, select the standard-grade tile, and generally pack 100 pieces of tile into each box. In 1961, the U.S. Department of Commerce issued voluntary recommended standards for grading tile (American standards). Standard-grade tile has no visible imperfections such as bumps, slivered edges, unglazed edges, cracks, or other imperfections. Second- and third-grade tile have varying degrees of such imperfections. Under the American standards, each box of tile labeled "standard grade" may contain no more than 5-percent second-grade tile and no third grade.

In addition to grading the tile based upon visible imperfections, the sorters are also required to make certain that the color of all tile in a box is uniform and that each box is marked with the correct shade number. If the color grading of the tile is not performed properly, its installation will be more expensive since the purchaser will be required to use additional labor to sort the tile.

Uniform sizing is also a factor in making and grading tile. The chemical content of the tile is important in insuring uniform sizes. During the "firing" process, the tile body undergoes some shrinkage. By having a uniformly blended "body," the shrinkage will be uniform and can thus be controlled. Uniform sizing is important to the tile purchaser for, if the sizing is not uniform, much more labor will be required to install the tile.

### Purchases from Productos

In 1951 and 1954, Dallas Ceramic purchased tile from Productos Ceramicos, S.A. (Productos), a Mexican corporation with its principal place of business in Monterrey, Mexico. The brand name of such tile was Procesa. The quality of the Procesa tile was similar to the quality of the tile which Dallas Ceramic was making at that time, except that different standards were applied to the grading of the Procesa tile. At times, a box of

Procesa tile labeled standard included as much as 25-percent second-grade tile and sometimes even some third-grade tile. Productos sold, as standard grade, colored plain-glaze $4\frac{1}{4}$-inch wall tile for 24.96 cents per square foot and colored dura-glaze $4\frac{1}{4}$-inch tile for 28.80 cents per square foot, f.o.b. Monterrey, Mexico, during 1954 and 1955. Since 1954, the costs of manufacturing tile in Mexico have increased.

Juan was a founder of Productos in 1944. He owned 19 percent of its stock and was the production manager of its tile plant until 1954, when he sold his stock and left Productos. As production manager, Juan was in charge of production, grading of tile, computing the cost of manufacturing tile, and purchasing raw materials used in manufacturing tile.

### Formation of Ceramica Regiomontana, S.A.

On November 17, 1955, Juan organized Ceramica Regiomontana, S.A. (Ceramica), a Mexican corporation, which began producing tile in December 1955. The shareholders of Ceramica in 1955 through 1966 were Juan, his wife, Maria Christina Brittingham, his mother, Roberta, and three qualifying shareholders, who each owned 1 share. Juan controlled and operated the assets of his mother under a power of attorney.

Robert did not assist Juan in the organization of Ceramica's plant in Monterrey, but two Dallas Ceramic employees did go to Monterrey to assist in the plant layout. One employee stayed for 2 weeks; the other employee stayed permanently and was hired as production manager at Ceramica.

Ceramica manufactured ceramic glazed wall and floor tile which was exported to the United States and also sold to purchasers in Mexico. It manufactured $4\frac{1}{4}$-inch flat tile, 6- by 6-inch flat tile, $4\frac{1}{4}$- by $8\frac{1}{2}$-inch flat tile, $4\frac{1}{4}$- by 6-inch flat tile, and $4\frac{1}{4}$-inch scored tile. Each of these types of tile was made in 19 bright colors, 19 crystalline colors, 11 jewel colors, 6 faience colors, and 9 marble colors. The flat tile was made in plain glaze, dura glaze, mottle glaze, and in an extensive line of decorative designs. It also manufactured all the trim shapes (approximately 96 different shapes) necessary for the commercial tile market in the United States. The trim shapes complemented each of the various lines and types of tile. Dal-Monte was the trade name of the tile made by Ceramica.

## Purchase of Dal-Monte Tile

When Juan first formed Ceramica, he entered into negotiations with Robert, acting on behalf of Dallas Ceramic, for the sale of Dal-Monte tile to Dallas Ceramic. Dallas Ceramic agreed to purchase Ceramica's tile if it satisfied a number of conditions. Dallas Ceramic required that the tile be uniform in size and shading, that it must be a complete line with all necessary trim pieces, that the Dal-Monte colors match the Dal-Tile colors, and that the tile be graded in accordance with American standards and packed in boxes similar to those used by American manufacturers. In addition, Ceramica was required to use raw materials specified by Dallas Ceramic and maintain, at all times, an inventory of tile equal to $1\frac{1}{2}$ months' production in order to give Dallas Ceramic prompt service on its orders. Dallas Ceramic's orders were to be given preference over all other purchasers. It was also to be granted 180 days' extended credit on its purchases.

These conditions were valuable to Dallas Ceramic since they insured that the Dal-Monte tile would be nearly identical to its own Dal-Tile. By requiring that Ceramica use its tile "body" and glaze formulas, Dallas Ceramic insured that the Dal-Monte tile would be uniform in size and shade, making it interchangeable with Dal-Tile to some degree. The requirement that Ceramica produce a complete line of trim pieces enabled Dallas Ceramic to satisfy the most demanding specifications established by architects for construction projects in the United States, thereby enabling it to compete for every type of construction project. The boxes required by Dallas Ceramic were of a higher quality than the boxes used by other Mexican manufacturers and helped insure the safe shipping of the tile. The large inventory requirement allowed Dallas Ceramic to provide excellent service to its customers. Finally, by requiring Ceramica to grade its tile in accordance with American standards, the Dal-Monte tile was able to compete with the best American-made tile.

Ceramica agreed to the conditions specified by Dallas Ceramic and entered into an agreement whereby Dallas Ceramic was appointed Ceramica's sole and exclusive distributor in the United States. A price list for the tile was agreed to based upon what each company considered a fair price. The $4\frac{1}{4}$-inch plain-glaze tile was priced at 31.6 cents per square foot, while the $4\frac{1}{4}$-inch

dura-glaze tile was priced at 34.6 cents per square foot.[4] These two types of tile were the ones most commonly used. Prices were also set for the other types of tile, including trim pieces.

As a result of the excellent quality of the Dal-Monte tile and the conditions required by Dallas Ceramic, Dal-Monte tile had acquired an excellent reputation by 1963. This reputation enabled Dallas Ceramic to sell the tile for much higher prices than other Mexican tile sold in the United States.

The conditions required by Dallas Ceramic increased Ceramica's costs of production in comparison with other Mexican manufacturers. The boxes used by Ceramica for packing the tile were more expensive than those used by other Mexican manufacturers. Mexican tile contractors used primarily four basic trim pieces, while American commercial contractors required a much more extensive line of tile; thus, Ceramica was required to purchase over 60 dyes used in making trim pieces, which cost from $3,000 to over $12,000 each, and which would not have been necessary in manufacturing tile for sale in Mexico. Furthermore, since the Mexican tile contractors did not normally use the numerous trim pieces made by Ceramica, it did not have a ready market for its excess production; consequently, making such a large variety of trim pieces also increased Ceramica's costs of production in relation to other Mexican manufacturers. Another condition which increased Ceramica's relative costs of production was the requirement that it match its colors to those used by Dallas Ceramic; as a result, it manufactured some colors which were not compatible with the colors commonly used in Mexico.

Dallas Ceramic purchased the Dal-Monte tile f.o.b. Monterrey, Mexico, with title to the tile passing to Dallas Ceramic in Monterrey. It paid all costs of freight and insurance from Monterrey to the various points of destination and paid all customs duties and brokerage fees incurred by importing the tile into the United States. The tile was normally packed in boxes containing 100 pieces. Each box was stamped with the Dal-Monte trademark, and the trademark also appeared on the reverse side of each piece of tile.

During the early 1960's, Japanese manufacturers began selling ceramic tile to American purchasers at very low prices. Such

---

[4] All references to prices hereinafter will be for tile graded standard in accordance with American standards.

competition caused American manufacturers to lower their prices. As a result, Dallas Ceramic had several talks with Ceramica concerning a reduction in the price of its Dal-Monte tile. In 1962, Ceramica agreed to lower the price of its 4¼-inch plain-glaze and dura-glaze tile to 28.8 cents and 31.6 cents per square foot, respectively. Dallas Ceramic paid such prices during the period 1963 through 1966. During such years, the 4¼-inch plain-glaze and dura-glaze tile represented between 67 and 70 percent of the tile purchased from Ceramica in terms of volume of pieces and approximately 53 percent of the dollar volume of sales.

Dallas Ceramic sold the Dal-Monte tile both through its warehouses and directly to its customers. During the years at issue, approximately 30 percent of the Dal-Monte tile was shipped directly from Monterrey to its customers and was never placed in Dallas Ceramic's warehouses. The tile was sold according to a published price list. The list price of the 4¼-inch plain-glaze Dal-Monte tile was 50 cents per square foot, and the list price of the 4¼-inch dura-glaze tile was 55.5 cents per square foot. Discounts from the list price were given to certain large volume purchasers, and although these discounts varied, the average discount was 10 percent of list price. The invoice prices of the tile purchased from Ceramica, the net costs of the tile sold, the net receipts from the tile sold, and Dallas Ceramic's gross profits from the sale of the Dal-Monte tile were as follows:

| Year | Invoice prices | Net costs | Net receipts[1] | Gross profits |
|------|---------------|-----------|-------------|---------------|
| 1963 | $2,392,585 | $2,790,107 | $3,527,606 | $737,499 |
| 1964 | 2,253,814 | 2,661,108 | 3,421,085 | 759,977 |
| 1965 | 2,401,983 | 3,027,417 | 3,734,888 | 707,471 |

[1] Gross receipts less the average discount of 10 percent.

The evidence in the record does not disclose the portion of Dallas Ceramic's overhead and selling expenses properly allocable to the sale of the Dal-Monte tile so that its net profits from such sales cannot be determined.

### Method of Payment for Dal-Monte Tile

Dallas Ceramic paid Ceramica for the Dal-Monte tile by issuing two checks each time a group of invoices was paid. Beginning in 1955 and ending in 1962, the practice was to compute the total amount of all the invoices being paid at that

time, and two checks were issued—one in the amount of 65 percent of the total and the other in the amount of 35 percent of the total. Both checks were then mailed to Ceramica in Monterrey, Mexico, in payment for the tile. In September 1962, the percentages of the two checks changed to 60 and 40 percent. The two-check method of payment continued through the years at issue. Dallas Ceramic paid for the Dal-Monte tile in this manner because Ceramica requested that it do so. Both checks were issued to pay Ceramica for the tile it sold to Dallas Ceramic.

Dallas Ceramic never attempted to conceal on its books and records the fact that two checks were issued for the payment of the Dal-Monte tile. On March 12, 1958, Robert described the two-check procedure to a customs agent from the U.S. Department of the Treasury, both orally and by letter. The two-check method of payment was readily apparent to the Commissioner's agents when they audited Dallas Ceramic's books.

Until July 1963, Ceramica deposited all the checks it received from Dallas Ceramic in its Mexican bank accounts, but beginning in that month, the 40-percent checks were mailed to Ceramica in Monterrey, where they were endorsed and deposited by mail in its account at the Republic National Bank (Republic) in Dallas, Tex. Later, the 40-percent checks were mailed directly to Republic for deposit in Ceramica's account.

Pursuant to instructions given to Republic by Juan, as director general of Ceramica, whenever the balance of Ceramica's account at Republic exceeded $1,000, any excess was to be transferred to account No. 66-351-4 in the name of Juan Brittingham and Angel Marroquin at Republic. Beginning on April 20, 1965, the excess from Ceramica's account was transferred to account No. 80-104-6 in Juan's name at Republic. In addition to Juan, Angel Marroquin and Harold Turk, officers of Ceramica, were authorized to withdraw funds from each of the three accounts at Republic. Personal funds belonging to Juan, his wife, and Roberta were also deposited in account Nos. 66-351-4 and 80-104-6. The money in such accounts was used both by Juan personally and by Ceramica. Ceramica's accountants kept records concerning the interest of each person in the accounts, but no evidence of any formal accounting of the funds was presented to the Court. On two occasions during the years 1963 through 1966, checks issued to Ceramica were deposited directly into Juan's account at Republic, but these deposits were made by mistake and did not

reflect a change in the procedure for handling the 40-percent checks.

## Ownership and Control of Dallas Ceramic and Ceramica

During the years 1963 through 1966, the shareholders of Dallas Ceramic were as follows:

| Shareholder | Stock owned 1/1/63 | Percent of ownership | Stock owned 1/1/64-12/31/66 | Percent of ownership |
|---|---|---|---|---|
| Robert | 5,760 | 16 | 5,760 | 16 |
| Robert G. Brittingham, son of Robert | 1,260 | 3.5 | 3,780 | 10.5 |
| John G. Brittingham, son of Robert | 1,260 | 3.5 | 3,780 | 10.5 |
| Juan | 360 | 1 | 360 | 1 |
| Maria Christina Brittingham, wife of Juan | 5,400 | 15 | 5,400 | 15 |
| Barbara B. de Marroquin, daughter of Juan | 840 | 2.33 | 2,520 | 7 |
| Christina B. de Lobeira, daughter of Juan | 840 | 2.33 | 2,520 | 7 |
| Roberta Brittingham, daughter of Juan | 840 | 2.33 | 2,520 | 7 |
| Albert A. Brittingham, uncle of Robert and Juan | 3,600 | 10 | 3,600 | 10 |
| Harry A. Brittingham, uncle of Robert and Juan | 3,600 | 10 | 3,600 | 10 |
| Alice Jean Brittingham, daughter of Harry | 360 | 1 | 360 | 1 |
| Denise Brittingham, daughter of Harry | 360 | 1 | 360 | 1 |
| Elizabeth Brittingham, daughter of Harry | 360 | 1 | 360 | 1 |
| Mary Joan Brittingham, daughter of Harry | 360 | 1 | 360 | 1 |
| Jack E. Jenkins | 6,120 | 17 | 0 | 0 |
| Esperanza B. Mabee, aunt of Robert and Juan | [1] 720 | 2 | 0 | 0 |
| Nem & Co. | 0 | 0 | 720 | 2 |
| Edward G. Brittingham, cousin of Robert and Juan | 1,980 | 5.5 | 0 | 0 |
| Joy B. Snell, cousin of Robert and Juan | 300 | .83 | 0 | 0 |
| Joanne Gail B. Halbert, cousin of Robert and Juan | 300 | .83 | 0 | 0 |
| Jeanne B. McCormick, cousin of Robert and Juan | 1,380 | 3.83 | 0 | 0 |
| Total | 36,000 | | 36,000 | |

[1] Dallas Ceramic's capital stock ledger indicates that Esperanza B. Mabee's stock was transferred to Nem & Co. on Nov. 1, 1964.

Roberta owned no stock in Dallas Ceramic during such period.

The annual shareholder meetings of Dallas Ceramic were not attended by most shareholders during the period 1963 through 1966. Only in 1963 did any shareholder other than Robert and Juan attend the annual meeting in person, but many shareholders gave their proxies to Robert and Juan each year. Robert and Juan were each directors during the years in issue and attended all meetings of the board of directors. Robert served as president of Dallas Ceramic for such years. Juan was not an officer during this period. Robert, as president, controlled the daily policies and actions of Dallas Ceramic. Juan neither had, nor exercised, the power to dictate corporate actions, to give orders, or to formulate policy at Dallas Ceramic.

The exact stock ownership of Ceramica during the years in issue is unclear. The stock was principally owned by Juan, his wife, and Roberta, whose stock was controlled by Juan. During the years in issue, Roberta took no part in the management of Ceramica. Robert has never been a shareholder nor member of any governing board of Ceramica, and Dallas Ceramic owned no stock in Ceramica. During the years in issue, Juan completely controlled the operations and policies of Ceramica, and Robert had no control, directly or indirectly, over the management or operation of Ceramica.

Neither Robert, his children, nor Dallas Ceramic received from Ceramica any kickbacks, rebates, loans, dividends, or payments of any kind because of Dallas Ceramic's purchase of tile from Ceramica. Robert never received any of the money paid to Ceramica by Dallas Ceramic and deposited in its account at Republic. Juan and Robert frequently went on hunting trips together, and on two occasions, Juan paid Robert's expenses.

### Sale of Dal-Monte Tile in Mexico

In 1963, Ceramica sold approximately 26 percent of its tile in Mexico, and by 1966, such sales had increased to 41 percent. During these years, it had from 96 to 127 independent distributors located throughout the Republic of Mexico (Mexican distributors). Neither Juan nor Ceramica owned or controlled, directly or indirectly, any of these distributors.

The Dal-Monte tile sold by Ceramica in Mexico was identical to the tile sold to Dallas Ceramic. The Mexican distributors in Monterrey paid about 38.6 cents per square foot for the 4¼-inch plain-glaze and dura-glaze tile, f.o.b. Monterrey, while the Mexican distributors in Mexico City paid about 35.8 cents per square foot for the same tile, f.o.b. Mexico City, during the years in issue. A 5-percent prompt payment discount was given to a distributor if he paid for the tile within 30 days. The prices Ceramica charged the Mexican distributors for the many other types of tile and trim were not proven at trial. The evidence suggests that each of the Mexican distributors was a retailer selling directly to the public, and the amount of tile purchased from Ceramica by each of such distributors was very small in comparison to the amount of tile purchased by Dallas Ceramic.

### Comparison of Dal-Monte and Procesa Tile

Productos and its successors continued to manufacture Procesa tile in Monterrey, Mexico, through the years in issue. During some of such years, the company was known as Ideal Standard, S.A. It sold its tile primarily for use in Mexico, but it did sell approximately $500,000 worth of tile a year to distributors in the United States during some of such years.

The Procesa tile was similar to the Dal-Monte tile in that it was made with substantially the same raw materials by a process similar to that used by Ceramica. To a layman, a 4¼-inch piece of Dal-Monte tile looks very similar to a 4¼-inch piece of Procesa tile. However, despite the superficial similarities, the quality and value of the two brands of tile were substantially different.

Ceramica manufactured a complete line of tile and trim pieces including over 300 types, and such tile was manufactured in more than 60 colors. On the other hand, Ideal Standard produced a much more limited line of tile. Procesa tile was available in less than 50 types and in only 25 colors. In addition, because of the large inventory maintained by Ceramica and the preference given to the orders of Dallas Ceramic, it could provide good service for its customers; whereas, Ideal Standard offered only a limited amount of tile for sale to customers in the United States, and that tile was available only on a quota basis.

The ability to provide good service aids substantially in the sale of tile. The plentiful and dependable supply of tile, together with a wide variety of trim pieces, can save tile contractors much

time and money when the tile is being installed. Dallas Ceramic was able to attract business due to the excellent service it provided on the Dal-Monte tile. On the contrary, the American distributors of Procesa tile were not able to provide such good service to their customers due to the limited quantity and variety of Procesa tile available, and such situation reduced the demand for such tile. Tile contractors were willing to pay more for the Dal-Monte tile because of the better service.

In addition, the Procesa tile sold in the United States was "kiln-run" and was not graded to American standards. Each box contained a mixture of standard, second, and third grade tile, and the quality of the tile varied widely from box to box. Ideal Standard's price list to its American distributors did not specify that the Procesa tile was standard grade. At least some of the boxes had the blue standard grade label on them, but the Procesa tile was not standard grade and did not meet the voluntary American standards. This difference in quality of tile also caused the Procesa tile to be worth less in the United States than the Dal-Monte tile.

In order to be used on any commercial construction project, ceramic tile must be accepted by the architect. The architect must decide whether the tile selected by the contractor meets the requirements for which it will be used. Since the commercial construction business uses a large amount of ceramic tile, it is important that a brand of tile is accepted by architects.

During the years 1963 through 1966, Dal-Monte tile was architecturally accepted and used on many large construction projects. However, Procesa tile was rarely, if ever, used on such projects. Procesa tile was used primarily in small houses, apartments, or motels, where costs were the overriding consideration.

During the years in issue, the trade name Dal-Monte enjoyed a good reputation and was considered a first-quality tile. Procesa, on the other hand, had a poor reputation. It was regarded as an inferior product comparable to other companies' second-quality tile. Procesa distributors usually sold a first-quality line of tile for architecturally controlled jobs and used the Procesa tile as a second line.

Ideal Standard sold the 4¼-inch plain-glaze and dura-glaze Procesa tile to the American distributors for 22 cents and 27.5 cents per square foot, respectively, f.o.b. Monterrey. The Procesa

tile was generally sold in the United States at prices below all domestic and imported standard-grade tile. First-quality tile, such as Dal-Monte, available in a plentiful supply, was worth from 15 to 30 cents more per square foot to the tile contractors than the inferior grade tile.

### Customs Determinations

Dallas Ceramic was required to pay customs duties on the Dal-Monte tile it imported into the United States. The amount of such duties was based upon its value as determined by the U.S. Bureau of Customs (customs value). The customs laws were amended effective in 1958 to provide that the customs value shall normally be the export value, defined as the price at which such or similar merchandise is "freely sold or, in the absence of sales, offered for sale" in the principal markets of the exporting country, in the usual wholesale quantities and "in the ordinary course of trade" for exportation to the United States. 19 U.S.C. sec. 1401a(b) (1970 ed.). The term "freely sold or, in the absence of sales, offered for sale" is defined in 19 U.S.C. sec. 1401a(f)(1) to mean sold or offered:

(A) to all purchasers at wholesale, or
(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

In 1958, Dallas Ceramic employed an attorney, specializing in customs law, to seek a determination by the Bureau of Customs of the correct customs value under the amended law. The customs attorney prepared a letter to the Bureau of Customs dated March 10, 1958, which was signed by Robert and Juan on behalf of Dallas Ceramic and Ceramica, respectively. Such letter disclosed the stock ownership of both corporations and made several arguments why the customs value of the Dal-Monte tile was not the price which Ceramica charged Dallas Ceramic for it (invoice price):

Actually Ceramica * * * does not offer the tile for sale to Dallas Ceramic, and the price at which it is invoiced to Dallas Ceramic is arrived at in the following manner: Mr. Jack [Juan] Brittingham of Ceramica * * * and Officials of Dallas Ceramic * * * get together, and the Officials of Dallas Ceramic * * * decide on what price they can pay for the tile manufactured by Ceramica * * *, taking into consideration that the sales price in the United States of such tile will be ten or fifteen percent less than the sales price of similar tile manufactured and sold by Dallas Ceramic * * *

Due to the control of the Brittingham families and relatives of the two companies, the law of supply and demand has no bearing on the price paid for the tile nor is there any opportunity of bargaining between seller and receiver, and the invoice price arrived at cannot be said to fairly reflect the market value of the merchandise.

It seems very evident that the procedure used in arriving at the invoice value of the goods cannot be used in the ordinary course of trade, which means the conditions and practices, which for a reasonable time prior to the exportation of the merchandise was normal in the trade under consideration with respect to merchandise of the same class or kind.

The letter stated that, instead of using the invoice price, the price of "similar" tile should be used to determine the customs value:

It is our opinion that tile shipped by Ceramica * * * to Dallas Ceramic is similar to tile manufactured and shipped to the States by Productos * * * at Monterrey. This opinion is based on the following reasons: The tile manufactured by both plants in Monterrey meets Federal specifications of U. S. Bureau of Standards for Grade No. 1 and Grade 2 glazed, wall, and floor tile. Labels are attached to the boxes shipped showing such grades. Mr. Jack [Juan] Brittingham was part owner of the tile factory, Productos * * *, until about three years ago when he sold his interest and organized and started operating the tile plant Ceramica * * *. He is thoroughly familiar with the procedure and material used in making tile. According to information furnished by Mr. Jack Brittingham, the materials used in the manufacturing of tile are Clay, Talc, Feldspar, Lead, Borax, Flourspar [sic], Color Stain, and Silica. Both plants, Productos * * * and Ceramica * * * use these materials and in many instances the materials are obtained from the same suppliers, however, Productos * * * uses a small amount of Kaolin Clay which is not used by Ceramica * * *. This clearly indicates that the tile of both plants is composed of approximately the same materials. The tile is made of the same size and to U. S. Grade Specifications with identical lugs, and if of same color and shade, it would be commercially interchangeable and adaptable to the same use. The cost of labor in both plants is approximately the same, which means that the cost of manufacturing per square ft. of tile is approximately the same.

It is our opinion that the above information clearly indicates that the tile shipped by Ceramica * * * is similar in all respects to the tile exported to the United States by Productos * * *, and in the absence of export value on tile shipped to the States by Ceramica * * * the export price of similar tile exported to the States by Productos * * * is proper for appraisement purposes.

On April 18, 1958, the customs attorney sent another memorandum to the Bureau of Customs containing additional arguments why she felt that the invoice price was not the proper customs value. She argued that the invoice price did not "fairly reflect the market value" of the Dal-Monte tile for several reasons. She stated that Ceramica was selling the Dal-Monte tile

in Mexico for home consumption at the same prices as similar tile, such as Procesa, was sold. These prices were lower than the invoice prices to Dallas Ceramic. She also stated that while Dallas Ceramic paid more for the Dal-Monte tile than other American importers paid for similar Procesa tile, the two tiles were retailed in the United States at about the same price. Thus, she concluded that the invoice price of the Dal-Monte tile did not "fairly reflect the market value." The customs attorney further argued that because Dallas Ceramic and Ceramica were "related persons" under customs law within the meaning of 19 U.S.C. sec. 1401a(g)(2) (1970 ed.) and that because the Dal-Monte tile was not sold "in the ordinary course of trade" at prices which "fairly reflect the market value," the sales were not "arm's-length transactions."

The Bureau of Customs later determined that the sales of Dal-Monte to Dallas Ceramic were not "in the ordinary course of trade" at a "price which fairly reflects the market value of the merchandise" so that the invoice price could not be used to determine customs value. It further determined that the price of Procesa tile imported into the United States was an acceptable basis upon which to determine customs value. Any type of tile made by Ceramica and not made by Productos was to be valued by other means. Thus, the customs value was significantly less than the invoice price of the Dal-Monte tile. Through an error by some customs agents, Dallas Ceramic was charged duties based upon the invoice price, resulting in substantial overpayments. Dallas Ceramic was able to recover these overpayments in the period 1963 to 1965.

In 1962, a customs agent made inquiries of Ceramica to determine the "constructed value" of the types of tile made by Ceramica but not made by other Mexican manufacturers. Constructed value in customs law is defined as the sum of:

(1) the cost of materials * * * and of fabrication or other processing of any kind employed in producing such or similar merchandise, * * * in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers * * * and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States. [19 U.S.C. sec. 1401a(d) (1970 ed.).]

The Bureau of Customs determined that the constructed value of the Dal-Monte tile was obtained by reducing the invoice price by 53.31 percent and by adding to the amount so obtained 35.72 percent of the invoice price. The net result of this formula was that the constructed value of the tile valued in this manner was 82.41 percent of the invoice price. No evidence was presented at trial explaining how this formula was devised.

In 1970, the Bureau of Customs began valuing the Dal-Monte tile at the invoice price, rather than by the methods previously used. Dallas Ceramic has filed protests of this action. In May 1973, Robert wrote a letter on behalf of Dallas Ceramic to the Commissioner of Customs in which he stated the reasons why the invoice price was not the proper customs value. The letter provided in part:

There have been no changes, over the intervening years, in the material facts asserted in 1958 in our application to the Bureau of Customs for a ruling on the dutiable value of tile manufactured in Mexico by Ceramica * * * and imported into the United States by Dallas Ceramic * * *. Controlling interest in Ceramica * * * is still held by Mr. Juan (Jack) Brittingham and members of his immediate family, who also own and control over 20% of the stock in the importing firm, Dallas Ceramic * * *. I, Robert M. Brittingham, the brother of Juan Brittingham, still own 16% of the stock of Dallas Ceramic * * *, the balance of which is still owned by other relatives of both. This has been true throughout the period of the importations covered by the above case and continues to the present.

This letter also contained his arguments why Dallas Ceramic's position with the Internal Revenue Service concerning the application of section 482 to its transactions with Ceramica was not inconsistent with its representations to the Bureau of Customs.

### District Court Case

The Commissioner determined a deficiency in, and an addition to, the Federal income tax of Dallas Ceramic for the taxable year 1966. Dallas Ceramic paid the deficiency and penalty for that year, plus interest, and brought suit for refund in the U. S. District Court for the Northern District of Texas (District Court). On November 6, 1974, after a nonjury trial, the District Court issued its Findings of Fact and Conclusions of Law. *Dallas*

*Ceramic Co. v. United States,* an unreported case (N.D. Tex. 1974, 35 AFTR 2d 75-394, 74-2 USTC par. 9830). The District Court concluded that Dallas Ceramic and Ceramica were owned or controlled, directly or indirectly, by the same interests; that Dallas Ceramic failed to prove that the Commissioner's allocation pursuant to section 482 was unreasonable, arbitrary, or capricious; and that the fraud penalty was properly imposed. On November 26, 1975, the District Court ordered that the trial of that case be reopened for an evidentiary hearing, but at the time of the filing of this opinion, the matter is still under consideration by the District Court.

### Returns of Juan Brittingham

Juan was a nonresident alien living in Mexico during the years in issue. His U. S. income tax returns for such years (Form 1040B) were prepared by a certified public accountant in the United States.

The 40-percent checks which were sent to Ceramica in Monterrey, Mexico, during 1963 for the Dal-Monte tile totaled $441,983.68. The following table sets forth the amounts deposited in account Nos. 66-351-4 and 80-104-6 at Republic during the years indicated, the amounts which the Commissioner now concedes are not income from U. S. sources, and the amounts which he claims to be income from such sources:

| Year | Amount | Amount conceded by Commissioner | Amount claimed by Commissioner |
|---|---|---|---|
| 1963 | $1,928,014.49 | $1,507,799.62 | $420,214.87 |
| 1964 | 3,043,523.47 | 2,115,453.30 | 928,070.17 |
| 1965 | 1,771,195.83 | 830,407.44 | 940,788.39 |
| 1966 | 2,001,272.73 | 1,122,431.99 | 878,840.74 |

All of the deposits which the Commissioner claims to have been unreported taxable income consist of the 40-percent checks issued by Dallas Ceramic to Ceramica pursuant to invoices for tile purchases and payments for technical services supplied to Dallas Ceramic by Ceramica.

During the years in issue, Juan was a partner in Texas Talc Co., which did business in the United States. As a result of settlement negotiations with the Commissioner, his income from the partnership was redetermined as follows:

| Year | Amount reported on return | Amount claimed in notice of deficiency | Agreed amount |
|------|------|------|------|
| 1963 | $5,060.10 | $12,909.48 | $9,118.89 |
| 1964 | 18,848.32 | 40,386.31 | 29,993.50 |
| 1965 | 790.42 | 21,265.36 | 11,380.91 |
| 1966 | 8,542.22 | 24,112.73 | 13,117.31 |

Juan failed to report dividend income from U. S. sources of $1,617.04 in 1963. However, since he was a nonresident alien, 30 percent of the dividends were withheld at the source so that he had an unclaimed tax credit of $635.11 in that year.

During the years in issue, Juan claimed the following deductions, dividends received credits, and investment credits on his U. S. income tax returns:

| Year | Deductions | Credits |
|------|------|------|
| 1963 | $33,314.32 | $1,226.78 |
| 1964 | 35,732.58 | 84.11 |
| 1965 | 34,090.11 | 0 |
| 1966 | 16,736.49 | 75.41 |

### Sale of Birmingham Property

In 1960, Dallas Ceramic purchased a lot in Birmingham, Ala. (Birmingham lot), for about $17,300, intending to build a warehouse on it. In February 1963, a real estate salesman in Birmingham wrote to Dallas Ceramic informing it that the market value of the Birmingham lot had increased and that the market price to someone who could use the lot would be from $22,500 to $25,000. Robert later decided that the lot did not satisfy the requirements of Dallas Ceramic since it was too small. Robert talked Juan and Mr. Marroquin into purchasing adjoining property upon which they constructed a warehouse and leased it to Dallas Ceramic. The Birmingham lot was then sold in December 1963 to Mr. Marroquin for $17,600. He was married to Juan's daughter, Barbara, who owned 7 percent of the stock of Dallas Ceramic. Juan loaned Mr. Marroquin the money to purchase the Birmingham lot.

### Residency of Roberta M. Brittingham

Roberta was born on March 22, 1891, in Janesville, Wis., and moved to Mexico when she was 5 years old. She was a U. S. citizen at birth, and in 1943, she also became a naturalized citizen of the Republic of Mexico and remained so during the

years in issue. At the time of the trial in this case, she was living in Monterrey, Mexico, was bedridden, and was unable to testify.

During the years in issue, Roberta received the following income:

| Year | Interest and dividend income | Long-term capital gain |
|------|------------------------------|------------------------|
| 1960 | $117,197.37 | 0 |
| 1961 | 106,066.44 | 0 |
| 1962 | 169,875.09 | 0 |
| 1963 | 120,897.15 | $7,521.21 |
| 1964 | 108,587.20 | 98,090.20 |
| 1965 | 153,901.00 | 0 |
| 1966 | 178,245.27 | 976.77 |

All of such income was derived from sources outside the United States, except for the long-term capital gain earned in 1966.

In 1941, 1942, and 1946, Roberta filed an Alien Registration Foreign Service Form with the U. S. Immigration and Naturalization Service. Each such form indicated that she was entering the United States for a period of 6 months for recreational purposes.

From 1945 to 1968, Roberta maintained an apartment in Beverly Hills, Calif. She regularly lived in such apartment and was seen there often by the mail carrier who delivered her mail for over 20 years. A phone was listed in her name in the local telephone directory for Los Angeles, Calif., from 1945 to 1968, and during the period 1963 through 1966, an average of almost three phone calls per month were made from Dallas Ceramic's offices in Dallas to Roberta's telephone number in Beverly Hills. She maintained a checking account in the Bank of America in Beverly Hills, Calif., and wrote approximately 35 checks on that account each month from 1961 through 1966.

At least during some of the years 1960 through 1966, Roberta held a passport issued by the Republic of Mexico. On June 27, 1965, and January 6, 1966, she filed an "Application to Extend Time of Temporary Stay" with the U. S. Immigration and Naturalization Service. The record does not disclose whether such applications were also made in prior years.

In 1965, after an investigation by the California Franchise Tax Board, Roberta filed late California resident income tax returns for 1960 and 1963. These returns include the statement that she had not filed returns for prior years because she thought she was not a resident of California. She filed timely California resident

tax returns for 1964, 1965, and 1966. One question asked on each return was whether the total income reported on the California tax return was the same as the total income reported on the Federal income tax return, and if not, an explanation was required. Roberta stated that she was a nonresident alien and did not file a Federal return.

### Notices of Deficiency

In his notice of deficiency to Dallas Ceramic, the Commissioner determined that Dallas Ceramic and Ceramica were commonly controlled and that the purchases of Dal-Monte tile from Ceramica were not arm's-length transactions. Using the values determined by the Bureau of Customs as the fair market price for the Dal-Monte tile, he reduced Dallas Ceramic's cost of goods sold by the following amounts:

| Year | Amount |
|------|--------|
| 1963 | $526,899.05 |
| 1964 | 453,430.80 |
| 1965 | 506,523.10 |

He also determined that all or part of the underpayment of tax was due to fraud and that section 6653(b) was applicable for all the years in issue.

In his notice of deficiency to Robert and Jeanne Brittingham, the Commissioner determined that the "40-percent checks" issued by Dallas Ceramic to Ceramica were "appropriated" to their use and benefit and represented unreported income in the following amounts:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1963 | $882,605.57 | 1965 | $978,113.34 |
| 1964 | 896,773.67 | 1966 | 882,630.06 |

It was also determined that the section 6653(b) fraud penalty was applicable for each of such years.

In his notice of deficiency to Juan Brittingham, the Commissioner determined that the bank deposits in Republic and certain checks issued to Ceramica by Dallas Ceramic were unreported income received by Juan from U. S. sources. The Commissioner has since stipulated that only the "40-percent checks" and some payments for technical services were unreported income of Juan. He also determined that at the instigation and direction of Juan, Dallas Ceramic sold the Birmingham lot to Mr.

Marroquin for $17,600 when its fair market value was $25,935. In addition, he determined that Juan did not file a true and accurate return for the years in issue so that the deductions and certain credits claimed by him were not allowable. Alternatively, he determined that Juan had not adequately substantiated some of his deductions. Finally, he determined that the section 6653(b) fraud penalty was applicable for all the years in issue.

In his notice of deficiency to Roberta M. Brittingham, the Commissioner determined that she had unreported income in each of the years in issue and that Roberta failed to file a return for each year without reasonable cause and was liable for the section 6651(a) penalty. In an amendment to answer, he determined additional amounts of unreported income.

OPINION

## 1. *Adjustments in Prices Paid by Dallas Ceramic*

Of the many issues to be decided in this case, the primary one is whether, pursuant to section 482, the Commissioner may allocate substantial amounts of income to Dallas Ceramic from Ceramica by adjusting Dallas Ceramic's cost of goods sold.

Section 482 provides:

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary ·or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The purposes of section 482 and the Commissioner's authority to effectuate such purposes were described in *Pauline W. Ach,* 42 T.C. 114, 125-126 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899 (1966), where it was said:

Respondent may allocate income under section 482 in order to prevent "evasion of taxes or clearly to reflect the income." The legislative history of section 482 indicates that it was designed to prevent evasion of taxes by the arbitrary shifting of profits, the making of fictitious sales, and other such methods used to "milk" a taxable entity. * * * The Commissioner has considerable discretion in applying this section and his determinations must be sustained unless he has abused his discretion. We may reverse his determinations only where the taxpayer proves them to be unreasonable, arbitrary, or capricious. * * *

See *Marc's Big Boy-Prospect, Inc.,* 52 T.C. 1073, 1092-1093 (1969), affd. sub nom. *Wisconsin Big Boy Corp. v. Commissioner,* 452 F.2d 137 (7th Cir. 1971); *T.V.D. Co.,* 27 T.C. 879, 884 (1957); H. Rept. No. 2, 70th Cong., 1st Sess. (1927), 1939-1 C.B. (Part 2) 384, 395; S. Rept. No. 960, 70th Cong., 1st Sess. (1928), 1939-1 C.B. (Part 2) 409, 426.

By using the standard of an uncontrolled taxpayer to determine the controlled taxpayer's "true taxable income," section 482 equalizes the treatment of controlled and uncontrolled taxpayers and prevents the artificial shifting of income between related businesses. *Huber Homes, Inc.,* 55 T.C. 598, 605 (1971); see *Baldwin-Lima-Hamilton Corp. v. United States,* 435 F.2d 182, 185 (7th Cir. 1970); *Kerry Investment Co.,* 58 T.C. 479, 484 (1972), affd. on this issue 500 F.2d 108 (9th Cir. 1974); *Asiatic Petroleum Co. (Delaware) Ltd.,* 31 B.T.A. 1152 (1935), affd. 79 F.2d 234 (2d Cir. 1935), cert. denied 296 U.S. 645 (1935); sec. 1.482-1(b)(1), Income Tax Regs.

The Commissioner contends that Dallas Ceramic and Ceramica were owned or controlled by the same interests and that the price Dallas Ceramic paid for the Dal-Monte tile purchased from Ceramica was not an arm's-length price. Thus, he argues that he properly reduced Dallas Ceramic's "cost of goods sold" to reflect what he alleges was the uncontrolled price of the tile to prevent the evasion of taxes. Petitioner Dallas Ceramic argues that the Commissioner acted without authority in making the section 482 allocation, since it was not owned or controlled by the same interests as Ceramica and since it paid an arm's-length price for the Dal-Monte tile. We agree with both positions urged by the petitioner Dallas Ceramic.

A. *Common ownership or control.*—For section 482 to be applied, there must be two or more organizations, trades, or businesses "owned or controlled directly or indirectly by the same interests." Section 1.482-1(a)(3) of the Income Tax Regulations defines "controlled" to include:

any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

Actual control and not record ownership determines whether the statute applies. See *Pauline W. Ach,* 42 T.C. at 125; *Grenada*

*Industries, Inc.,* 17 T.C. 231, 254 (1951), affd. 202 F.2d 873 (5th Cir. 1953), cert. denied 346 U.S. 819 (1953). The record in this case clearly demonstrates that Dallas Ceramic and Ceramica were not owned or controlled by the same interests within the meaning of section 482.

During the years in issue, Juan, his wife, and Roberta owned all the stock of Ceramica, except for a few qualifying shares. Juan controlled Roberta's shares pursuant to a power of attorney, and she took no part in the business affairs of the company. Juan was Ceramica's director general and exercised complete control over its operations and policies. Robert and his immediate family neither owned any stock in, nor exercised any control over, the operations of Ceramica.

During most of the years in issue, Robert and his children owned 37 percent of the stock of Dallas Ceramic, while Juan, his wife, and children owned an equal amount. The balance of the stock was owned by uncles, an aunt, and cousins of Robert and Juan. Robert and Juan each controlled the interests of his immediate family in Dallas Ceramic. However, neither Juan alone, nor together with his immediate family, did or could exercise control over the business policies of Dallas Ceramic.

The Commissioner apparently does not argue that either Robert or Juan alone owned or controlled the two companies. Rather, he maintains that the "family unit" of Roberta, Juan, and Robert constitutes the "same interests" necessary for the application of section 482, and that this "family unit" owns or controls both corporations. The petitioners agree that the members of such "family unit" collectively owned or controlled both corporations but vigorously deny that the family unit constitutes the "same interests."

The term "same interests" is not defined in the statute or regulations. Its meaning must be determined in light of the congressional purpose in enacting section 482. Such section is remedial in nature and must not be narrowly construed to frustrate the legislative intent. *Pauline W. Ach, supra.*

Section 482 was enacted to prevent the artificial shifting of income between controlled taxpayers to avoid Federal taxes. See H. Rept. No. 2, *supra;* S. Rept. No. 960, *supra.* In using the term "same interests," Congress apparently intended to include more than "the same persons" or "the same individuals." Different persons with a common goal or purpose for artificially shifting

income can constitute the "same interests" for the purposes of the statute. Cf. *Rishell Phonograph Co.,* 2 B.T.A. 229, 232-233 (1925). Thus, it is not necessary that the same person or persons own or control each controlled business before section 482 can be applied, but there must be a common design for the shifting of income in order for different individuals to constitute the "same interests." Here, the two businesses were owned and controlled by different individuals, and it is clear there was no design to shift income among them.

Without doubt, Roberta did not constitute the "same interests" controlling Dallas Ceramic and Ceramica since she owned no interest in Dallas Ceramic and exercised no control over the affairs of either corporation. Moreover, Robert and Juan, although brothers, each had his own family, and each was financially independent of the other. Any overpayment made by Dallas Ceramic to Ceramica would have been completely contrary to Robert and his family's financial interest since they had no interest in Ceramica and would have received no benefits from such overpayments. While it is true that Juan paid Robert's expenses on two joint hunting trips, the payment of such expenses would not be sufficient inducement to cause Robert to arrange for Dallas Ceramic to overpay for the Dal-Monte tile. To believe that Robert would be a part of a plan to divert $1.5 million from a corporation in which he and his children owned a 37-percent interest to a corporation in which his immediate family had no interest strains all credulity.

The many cases cited by the Commissioner do not establish the rule for which he argues. In *South Texas Rice Warehouse Co.,* 43 T.C. 540 (1965), affd. 366 F.2d 890 (5th Cir. 1966), cert. denied 386 U.S. 1016 (1967), four families owned equal interests in Warehouse and Enterprise. The ownership within each family group varied in that the children owned a larger share of each family's interest in Enterprise. We held that both businesses were controlled by the "same interests" and found that the variation in intrafamily ownership was not significant, since the purpose of forming Enterprise was to effectuate a short-term reallocation of income among the family members of certain units. However, the facts of that case are significantly different than those of this case. In that case, each family group owned an equal interest in each business, and the variation of ownership within each family group was a result of a plan by the fathers in

three of the families to shift income to their children. In this case, the families of Juan and Robert did not own proportionate interests in both corporations, and there was never a plan to shift income from Robert to Juan. Their fraternal relationship alone is not sufficient to infer that there existed any plan to shift income between them.

The Commissioner also relies upon *Charles Town, Inc. v. Commissioner,* 372 F.2d 415 (4th Cir. 1967), affg. a Memorandum Opinion of this Court, cert. denied 389 U.S. 841 (1967), to support his contention that Juan and Robert constitute the "same interests." In *Charles Town,* two brothers equally owned and controlled Fairmont and equally controlled Charles Town, although they owned very little of it. Income was shifted from Charles Town to Fairmont. We found that the two businesses were controlled by the "same interests." The Commissioner argues that the facts of the present case are analogous. However, in *Charles Town,* the brothers shared control of Charles Town and shared ownership and control of Fairmont to which the income was shifted; whereas, in this case, Robert and his family had no interest in Ceramica to which the Commissioner claims income was shifted. In view of Robert's lack of interest in Ceramica, we can find no reason for him to participate in a plan to shift income to that corporation, and accordingly, the *Charles Town* case is also not apposite.

The other cases relied upon by the Commissioner also involve significantly different facts. See *Advance Machinery Exch. v. Commissioner,* 196 F.2d 1006 (2d Cir. 1952), affg. a Memorandum Opinion of this Court, cert. denied 344 U.S. 835 (1952); *Jesse E. Hall, Sr.,* 32 T.C. 390 (1959), affd. 294 F.2d 82 (5th Cir. 1961); *Friedlander Corp.,* 25 T.C. 70 (1955); *Grenada Industries, Inc., supra.* In each case, the fact that different persons were related was not the sole basis for determining that the interests involved were the same; there also was evidence indicating that income was arbitrarily shifted. Each case involved either paternal or marital relationships, not fraternal relationships. Finally, in each case, the same people either owned or controlled an interest in each controlled business.

In his brief, the Commissioner cited a number of examples of transactions that occurred between Dallas Ceramic and Ceramica, in which he claimed that one of the businesses conferred special benefits on the other and which therefore

reflect a plan to divert income from one business to the other. However, none of such examples provide any evidence that income was shifted to Ceramica as part of a common purpose or scheme. The business relationships between the two corporations were extensive, and it was in the best interest of each of them to cooperate in the production and sale of high quality tile. The alleged preferences given to Dallas Ceramic were miniscule compared to the amount of income which the Commissioner claimed was improperly diverted to Ceramica. Robert appears to have been a successful businessman, and the transactions to which the Commissioner refers would clearly not be sufficient to have caused him to divert more than $1.5 million from a corporation in which he and his family owned a 37-percent interest.

B. *Arm's-length price*—We are also convinced that the Commissioner acted unreasonably in determining that the customs value constituted an arm's-length price for the sale of the Dal-Monte tile to Dallas Ceramic.

Section 1.482-2(e)(1)(i) of the Income Tax Regulations provides in part:

Where one member of a group of controlled entities * * * sells * * * tangible property to another member of such group * * * at other than an arm's length price * * *, the district director may make appropriate allocations between the seller and the buyer to reflect an arm's length price for such sale * * *. An arm's length price is the price that an unrelated party would have paid under the same circumstances for the property involved in the controlled sale. * * *

The regulations provide three basic methods for determining the arm's-length price: the comparable uncontrolled price method, the resale price method, and the cost-plus method. If there are comparable uncontrolled sales, the comparable uncontrolled price method must be used, since it is the most accurate method of establishing an arm's-length price. If there are no comparable uncontrolled sales, the resale method must be used if the requirements for its standards are met, since it is the method next most accurate in determining an arm's-length price. If neither the comparable uncontrolled price method nor the resale method can be used, the cost-plus method is applicable. See sec. 1.482-2(e)(1)(ii), Income Tax Regs.

Uncontrolled sales are sales in which the seller and the buyer are not owned or controlled by the same interests. Uncontrolled sales will be considered comparable to controlled sales if the

physical property and circumstances involved in the two sales are identical or so nearly identical that the differences can be reflected in a reasonable number of adjustments to the uncontrolled price. In judging whether sales are comparable and what adjustments need to be made in prices, some of the facts to be considered are differences in the quality of the product, sale terms, intangibles associated with the sale, and the level of the market and the geographic market in which the sale takes place. Sec. 1.482-2(e)(1)(ii), Income Tax Regs.; see *American Terrazzo Strip Co.,* 56 T.C. 961, 972-973 (1971); *Woodward Governor Co.,* 55 T.C. 56, 64-68 (1970).

Obviously, the customs value is not one of the methods provided in the regulations for determining an arm's-length price. Yet, in *Ross Glove Co.,* 60 T.C. 569, 605 (1973), we held that:

Considering the similarity between the constructed value computation of Customs and the cost-plus method of section 482, we find that the markups used by Customs in computing the value of gloves imported by Ross Glove may serve as a basis for determining an arm's-length price under section 482. Such markups may be used because they are the best available evidence as to the amounts that a seller would receive to cover overhead and profit in an arm's-length sale.

The Commissioner argues that the customs value should likewise be used in this case. However, in *Ross Glove,* we relied upon the customs determinations because they were the best available evidence; here, the evidence convinces us that the customs determinations were not indicative of an arm's-length price.

The Bureau of Customs based its valuation on the assumption that Dal-Monte tile was similar to Procesa tile in 1958. However, the evidence produced at the trial of this case clearly established that during the years 1963 through 1966, the Dal-Monte tile was far superior to Procesa tile in quality, availability, and reputation. Dal-Monte tile was available in many more shapes, colors, and styles than was Procesa. It was available in large and dependable quantities, thus allowing its distributors to provide better service to their customers. Dal-Monte tile met American grading standards, but Procesa did not. As a result, Dal-Monte tile was regarded as equal to all types of American-made tile, while Procesa was known as an inferior quality tile. These, together with other significant differences between the two tiles set forth in our Findings of Fact, make it entirely clear that the

Dal-Monte tile was significantly more valuable than Procesa. This conclusion is corroborated by the fact that in 1970 Customs increased its valuation to equal the invoice price paid for the Dal-Monte tile.

The Commissioner argues that Dallas Ceramic and Ceramica made representations to the Bureau of Customs in 1958 that Dal-Monte and Procesa were similar and should be estopped from repudiating such statements. The petitioner Dallas Ceramic argues that the representations to the Bureau of Customs are not inconsistent with its position in this tax case; it asserts that the apparent inconsistencies are due to differences between the customs and tax laws. However, it is not necessary for us to resolve this dispute.

In the first place, the Commissioner has failed to lay a basis for invoking the doctrine of estoppel; he has not established that he relied upon the customs statement to his detriment, and in the absence of the establishment of such fact, there can be no estoppel. See *Ross Glove Co.,* 60 T.C. at 593; *Northport Shores, Inc.,* 31 B.T.A. 1013 (1935). Yet, in judging the credibility of the testimony given by Robert and Juan in this case, their representations to the Bureau of Customs must be taken into consideration. However, Dallas Ceramic did not rely simply upon the testimony of Robert and Juan; it produced a number of other disinterested witnesses who testified as to the differences in the relative values of Procesa and Dal-Monte tile during the years in issue. We found the testimony of those disinterested witnesses to be altogether credible, and our conclusion was based on such testimony. Thus, our findings and holdings are based on the evidence of record in this tax case, and are made without having to decide whether some of the factual assertions made by Robert and Juan to the Bureau of Customs are reconcilable with their testimony in this case.

The Commissioner also relied upon the judgment of the District Court with respect to Dallas Ceramic's alleged overpayments in 1966. He does not argue for the application of the doctrine of collateral estoppel, but he does seek to apply the doctrine of stare decisis. However, since the District Court has ordered that case reopened for further evidentiary hearing, its judgment is not final and cannot be relied upon at this time. 1B Moore, Federal Practice, pars. 0.409[1], 0.416[1], and 0.416[3] (2d ed. 1948).

Since the Customs determination of value in 1958 was based upon an erroneous assumption as to the relative values of the Procesa and Dal-Monte tile, we hold that the Commissioner's determination of an arm's-length price for the sale of the Dal-Monte tile to Dallas Ceramic based on such value was unreasonable. The Customs determination established a formula for determining the value of the types of Dal-Monte tile not manufactured by Procesa. Since we have no explanation of the basis for such formula, and since the Customs determination of value was otherwise based on an erroneous assumption as to the relative values of Dal-Monte and Procesa tile, we also hold the Commissioner's determination to be unreasonable insofar as it relied upon such formula for determining the arm's-length price of Dal-Monte tile.

In support of its position, the petitioner Dallas Ceramic produced the evidence of the prices at which the Dal-Monte tile was sold in Mexico. However, we found that evidence not to be convincing because those sales appear not to be comparable to the sales to Dallas Ceramic. The sales in Mexico were made in much smaller quantities and were apparently made to retailers. Even though we found that evidence not to be helpful, we are satisfied by the other evidence as to the relative values of the Procesa and Dal-Monte tile in the years in issue that the price paid by Dallas Ceramic for the Dal-Monte tile was reasonable and may be considered an arm's-length price for purposes of section 482. Accordingly, we hold that no price adjustment was authorized by section 482.

## 2. *Fraud on the Part of Dallas Ceramic*

The second issue to be decided is whether the fraud penalty is applicable to Dallas Ceramic for the years 1963 through 1965.

Fraud is an intentional wrongdoing and the intent required is the specific purpose to avoid the payment of taxes believed to be owed. *Mitchell v. Commissioner,* 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), and Supplemental Opinion 45 B.T.A. 822 (1941); see *Ross Glove Co.,* 60 T.C. 569, 608 (1973); *William G. Stratton,* 54 T.C. 255, 284 (1970). The Commissioner must establish fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; *Mensik v. Commissioner,* 328 F.2d 147, 150 (7th

Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); *Blaine S. Fox,* 61 T.C. 704 (1974).

We find that the Commissioner has failed to present any evidence tending to establish fraud on the part of Dallas Ceramic. His argument of fraud is based on the assertion that Robert and Juan engaged in a scheme to overpay for the tile Dallas Ceramic purchased from Ceramic. However, we have previously found that there was no overpayment. Consequently, the first link in the Commissioner's tenuous chain of "evidence" is destroyed. While this finding effectively disposes of the fraud issue, we feel compelled to comment upon the rest of the Commissioner's "evidence."

The Commissioner contends that there are many indicia of fraud in this case. He argues that there was evidence of a double set of books, false entries, and the destruction of books or records. All of these allegations were made concerning Ceramica and not Dallas Ceramic. There was conflicting evidence that Ceramica kept two sets of books and made false entries in 1958, but such evidence, even if true, is not evidence of fraud by Dallas Ceramic. At most, it could raise questions as to whether Ceramica *may* have committed fraud in connection with the Mexican income tax. The Commissioner also complains that all the books and records of Ceramica for the years in issue were not produced. However, this failure was adequately explained. Most of the missing records were destroyed in a fire in 1966, and others were routinely destroyed after 5 years, since Mexican authorities did not require that records be maintained beyond that period. Furthermore, the Commissioner has not alleged how the missing books could possibly help in proving fraud on the part of Dallas Ceramic.

Another indicium of fraud alleged by the Commissioner is based upon Robert and Juan's statements to the Bureau of Customs. As we have previously indicated, we need not determine whether such statements are contrary to the facts established in this case. Even if a significant difference exists, it would only mean that possibly a fraud was committed on the Bureau of Customs. It does not mean that there was any fraud concerning Dallas Ceramic's payment of Federal income tax.

The Commissioner's final "badge" of fraud concerns the two-check method of payment used by Dallas Ceramic to pay the invoices from Ceramica. He refers to this method of payment as

"surreptitious" and "mysterious." However, the record clearly indicates that these statements are gross distortions of the truth. In 1958, Robert, as president of Dallas Ceramic, both orally and in writing, fully disclosed the two-check method of payment to a customs agent from the U.S. Treasury Department. Furthermore, the Commissioner's own special agent who initially investigated Dallas Ceramic was asked about the two-check method during his testimony at trial:

Q. Now, did you find that this was a big secret? Was this something hidden?
A. No, sir.
Q. As a matter of fact, it had been spelled out on the record at the United States Treasury Department since 1958, hadn't it * * *?
A. To the Treasury Department to Customs, yes, sir.

In light of this testimony by the Commissioner's own special agent, his references to the "mysteriousness" surrounding the payments are highly improper.

### 3. *Unreported Income of Robert and Jeanne Brittingham*

The next issue to be decided is whether the 40-percent checks issued by Dallas Ceramic to Ceramica from 1963 through 1966 for the tile it purchased were unreported income of Robert and Jeanne.

The Commissioner argues that Robert and Jeanne received additional unreported income on the theory that Dallas Ceramic overpaid for the Dal-Monte tile as a result of a common conspiracy between Robert and Juan. Since we have previously held that there was no such overpayment, no basis for the imputation of income to Robert remains. Moreover, since the Commissioner stipulated that the 40-percent checks were issued by Dallas Ceramic to Ceramica in payment for the Dal-Monte tile, they could not represent income to Robert. The Commissioner argues that Robert ultimately received the benefit of some of these funds, but the only specific benefits to which he alludes were those two occasions when Juan paid certain expenses of two joint hunting trips with Robert. Such benefits are hardly sufficient to establish that the 40-percent checks were income to Robert. Robert testified that he received no kickbacks, rebates, loans, dividends, or payments of any kind in connection with Dallas Ceramic's purchase of tile from Ceramica, and there was no evidence tending to contradict such testimony. Accordingly,

we find that the 40-percent checks were not unreported income of Robert and Jeanne.

The Commissioner also argues in the alternative that if an allocation under section 482 is authorized, the amount of the allocation is dividend income to Robert. See *Engineering Sales, Inc. v. United States,* 510 F.2d 565 (5th Cir. 1975); *Sammons v. Commissioner,* 472 F.2d 449, 453 n. 1 (5th Cir. 1972), revg. on another issue a Memorandum Opinion of this Court. Since we have found that no section 482 allocation is authorized, there can be no dividend income attributed to Robert and Jeanne for such reason.

The Commissioner also asserts that the fraud penalty is applicable to Robert and Jeanne during each of the years in issue. The Commissioner must establish fraud by clear and convincing evidence in order to prevail. *Blaine S. Fox,* 61 T.C. 704, 717 (1974).

The only evidence of fraud which the Commissioner relies upon is the failure to report the 40-percent checks as income. Since we have previously found that such checks were not income to Robert, there is absolutely no evidence of fraud on the part of Robert during the years in issue.

### 4. *Unreported Income of Juan*

The first issue we must decide involving Juan is whether he had unreported U.S.-source income during the years in issue. The Commissioner originally determined that almost all the deposits in Juan's accounts in Republic were unreported income; but the parties have since stipulated to the source of all such deposits, and the Commissioner has conceded that the majority of such deposits were not income. The only deposits not conceded by him are the proceeds of the 40-percent checks and certain check payments by Dallas Ceramic to Ceramica for technical services. The Commissioner also determined that the 40-percent checks sent to Ceramica in Mexico were unreported U.S.-source income. Thus, the only question to be decided is whether the deposits not covered by the concession and the checks sent to Mexico were unreported U.S.-source income.

The Commissioner argues that such deposits and checks were not issued to Ceramica in payment for tile, were not accounted for by Ceramica for Mexican tax purposes, and were subject to Juan's dominion and control. Juan vigorously denies each of these

arguments. We have already found that all the 40-percent checks were issued to Ceramica in payment for the Dal-Monte tile purchased in Mexico and that the other payments to Ceramica were for services actually rendered. Such findings adequately dispose of the Commissioner's first argument for treating such amounts as unreported income of Juan.

Juan submitted some evidence tending to show that Ceramica did in fact include all the payments which it received for the Dal-Monte tile in the income reported to the Mexican Government. However, we need not pass on the validity of such evidence, since the fact is immaterial in determining whether Juan received any unreported U.S.-source income. Whether Ceramica properly reported all its income to the Mexican Government is a matter for that country to decide, and has nothing to do with the questions properly before this Court.

Nor is there any merit in the Commissioner's argument that such deposits and checks constituted unreported income of Juan because he exercised dominion and control over them. Since we have found that such amounts were paid to Ceramica for tile, they could constitute income of Juan only if we found that they were diverted from such corporation. However, Ceramica was a foreign corporation, and Juan was a nonresident alien; accordingly, any dividends from such a corporation are includable in his U.S.-source income only if the corporation received income from U.S. sources. See secs. 872(a), 862(a)(2), and 861(a)(2).[5] The Commissioner has not contended that any dividends from Ceramica should be reported by Juan for U.S. tax purposes, and has never raised the question as to whether Ceramica had income from U.S. sources, and there is no evidence indicating that it had any such income. Under these circumstances, we need not decide whether Juan did in fact divert any of the deposits or checks to his personal use, since they would not, in any event, constitute income from U.S. sources.

The Commissioner also argues in the alternative that if his section 482 allocation is upheld, Juan received dividend income from Dallas Ceramic. Since we have found that no section 482 allocation is authorized, there can be no constructive dividend from Dallas Ceramic attributable to any section 482 adjustment.

---

[5] These sections were amended by the Foreign Investors Tax Act of 1966, 80 Stat. 1539.

## 5. *Disallowed Deductions and Credits of Juan*

Section 873(a) provides that in the case of nonresident alien individuals, deductions shall be allowed only if and to the extent that they are connected with income from U.S. sources. The rules for allocating deductions to income from within and without the United States are set forth in the regulations. Sec. 1.873-1, Income Tax Regs. However, section 874(a) provides in part:

(a) RETURN PREREQUISITE TO ALLOWANCE.—A nonresident alien individual shall receive the benefit of the deductions and credits allowed to him in this subtitle only by filing or causing to be filed a true and accurate return of his total income received from all sources in the United States, in the manner prescribed in subtitle F * * *, including therein all the information which the Secretary or his delegate may deem necessary for the calculation of such deductions and credits. This subsection shall not be construed to deny the credits provided by sections 31 and 32 for tax withheld at the source * * *

The Commissioner takes the position that Juan did not file "true and accurate" returns for the years in issue and that therefore all of his claimed deductions and certain credits must be disallowed.

Juan argues that section 874(a) merely requires the complete disallowance of all deductions and certain credits when *no* return is timely filed, and that such provision is not applicable to him because he did timely file a return each year. See *Frank W. Ross,* 44 B.T.A. 1 (1941); *Nicholas Roerich,* 38 B.T.A. 567 (1938), affd. 115 F.2d 39 (D.C. Cir. 1940), cert. denied 312 U.S. 700 (1941). However, such argument is contrary to the words of the statute and has been rejected in other cases. The meaning of the statute is emphasized in the regulations, sec. 1.874-1, which provides in pertinent part:

(a) *Return required.* A nonresident alien individual shall receive the benefit of the deductions and credits allowed to him with respect to the income tax, only if he files or causes to be filed with the district director (or, if applicable, with the Director of International Operations), in accordance with section 6012 and the regulations thereunder, a true and accurate return of his total income received from all sources within the United States. This paragraph shall not be construed, however, to deny the credits provided by sections 31 and 32.

(b) *Tax on gross income.* If a return is not so filed, the tax shall be collected on the basis of gross income, * * * without regard to any deductions otherwise allowable, and the only credits allowable against the tax so computed shall be those allowed by sections 31 and 32. This paragraph shall apply even though the tax determined in accordance with §1.871-7 has been fully satisfied at the source. * * *

When paragraph (a) of such regulations is read in conjunction with paragraph (b), it is clear that not only must a return be filed,

but that such return must be "true and accurate." To satisfy the statutory requirement, a "true and accurate" return of income from U. S. sources containing sufficient information upon which the claimed deductions and credits can be evaluated must be filed. Thus, the mere filing of a return is insufficient. Cf. *Fides, A. G.,* 47 B.T.A. 280, 285 (1942), affd. 137 F.2d 731 (4th Cir. 1943), cert. denied 320 U.S. 797 (1943); *Blenheim Co., Ltd.,* 42 B.T.A. 1248, 1253 (1940), affd. 125 F.2d 906 (4th Cir. 1942).

Juan also argues that the returns he filed each year contained only minor errors and were "true and accurate" within the meaning of section 874(a). That term is not defined in either the statute or the regulations. Furthermore, the legislative history of section 874 and its predecessors provides no insight into the proper construction of the term. The Commissioner concedes that minor errors in a return or simple disallowed deductions do not disqualify a return. However, he argues that where a nonresident alien has substantial amounts of unreported income, his returns are not "true and accurate."

Juan concedes that he had unreported income annually of $4,000 to $11,000 from the Texas Talc Co. To disallow all deductions and certain credits because of the omission of such amounts of income from a return may appear, in some circumstances, to constitute an unduly harsh penalty. However, such omissions are certainly material, and a return which omits them cannot be said to be "true and accurate." This provision of the statute is long standing, and the similar provision with respect to foreign corporations has been applied whenever returns fail to include material information. Sec. 882(c)(2); see *Fides, A. G., supra; Blenheim Co., Ltd., supra.* Under the circumstances, we must apply section 874(a) and sustain the Commissioner's disallowance of all the deductions and certain credits claimed by Juan. In view of that conclusion, we need not consider the Commissioner's alternative contention that Juan had failed to substantiate adequately some of his claimed deductions.

### 6. *Constructive Dividend to Juan*

It is well established that a sale of property by a corporation to a shareholder for an amount less than its fair market value will constitute a dividend if the sale "is in purpose or effect used as an implement for the distribution of corporate earnings to stockholders." *Palmer v. Commissioner,* 302 U.S. 63, 70 (1937); see

*Richard R. Riss, Sr.,* 56 T.C. 388, 429 (1971), affd. on this issue 478 F.2d 1160 (8th Cir. 1973); *Harry L. Epstein,* 53 T.C. 459, 474 (1969); *Lester E. Dellinger,* 32 T.C. 1178, 1181-1182 (1959); see also sec. 1.301-1(j), Income Tax Regs. Furthermore, dividend treatment is not avoided merely because the property is transferred for insufficient consideration to someone other than the shareholder. "It has been long recognized that where a corporation has made such a transfer to a member of the stockholder's family * * *, the stockholder has enjoyed the use of such property *no* less than if it had been distributed to him directly." *Harry L. Epstein, supra* at 474 (emphasis supplied); see *Byers v. Commissioner,* 199 F.2d 273 (8th Cir. 1952), affg. a Memorandum Opinion of this Court, cert. denied 345 U.S. 907 (1953); *Nicholls, North, Buse Co.,* 56 T.C. 1225, 1239 (1971); *Percy H. Clark,* 31 B.T.A. 1082, 1084-1085 (1935), affd. 84 F.2d 725 (3d Cir. 1936); cf. *Helvering v. Horst,* 311 U.S. 112 (1940).

The Commissioner determined that Dallas Ceramic sold the Birmingham lot to Juan's son-in-law for $17,600 when its fair market value was $25,935 at Juan's instigation and direction. The Commissioner argues that such transfer resulted in a constructive dividend to Juan of the difference between the sale price and the fair market value. Juan argues that the lot was not worth as much as the Commissioner alleges and that he received no benefit from the sale to Mr. Marroquin. Juan bears the burden of proof on this issue. Rule 142(a), Tax Court Rules of Practice and Procedure; *Lester E. Dellinger, supra.*

The only evidence in the record concerning the value of the Birmingham lot was a letter to Dallas Ceramic, written by a real estate salesman, 9 months prior to the sale. In such letter, the salesman expressed his opinion that the lot would be worth $22,500 to $25,000 to someone who could use the property. We find this letter, standing alone, to be of little probative value, and even Juan argues that such evidence is unreliable. Without some foundation evidence for the opinion expressed in the letter, the letter proves nothing concerning the actual fair market value of the lot. Consequently, since Juan has presented us with absolutely no evidence of the value of the lot, we must accept the Commissioner's determination of the value of the lot at the time of the sale as correct. Thus, the price paid for the lot was only two-thirds of its actual value.

The other question to be resolved is whether Juan exercised substantial influence in causing Dallas Ceramic to make the bargain sale. *Green v. United States,* 460 F.2d 412, 420 (5th Cir. 1972). Juan was a director of Dallas Ceramic and effectively controlled his family's 37-percent interest in the company. Obviously, he was well aware of the sale to Mr. Marroquin since he loaned his son-in-law the money to purchase the lot and was involved in building a warehouse on adjoining property. There is no evidence in the record to establish that he did not exercise substantial influence in causing Dallas Ceramic to make the bargain sale. Indeed, the circumstantial evidence tends to establish that he was influential in the sale. Since Juan has totally failed to present evidence satisfying his burden of proof, we must uphold the Commissioner's determination that the bargain sale was made at Juan's request. While it is true that Juan did not control Dallas Ceramic and had no right to compel the bargain sale, he did exercise substantial influence in causing the sale. *Green v. United States, supra.*

Juan's argument that he received no benefit from the bargain sale is without merit. He personally enjoyed the constructive dividend since he was able to confer a benefit on a member of his family. *Green v. United States, supra; Lester E. Dellinger, supra.* The fact that his daughter also owned stock in Dallas Ceramic is irrelevant since she did not influence the bargain sale. See *Nicholls, North, Buse Co.,* 56 T.C. at 1240. A constructive dividend can be found even though it is not a pro rata distribution to all shareholders and even though neither the shareholder nor the corporation intended a dividend. See *Crosby v. United States,* 496 F.2d 1384, 1388 (5th Cir. 1974); *Paramount-Richards Th. v. Commissioner,* 153 F.2d 602, 604 (5th Cir. 1946), affg. a Memorandum Opinion of this Court. Thus, the fact that Juan owned only 1 percent of the stock in Dallas Ceramic does not establish that he did not receive a constructive dividend. Upon the meager record before us, we hold that Juan received a constructive dividend of $8,335 in 1963 from Dallas Ceramic as a result of the sale of the Birmingham lot to Mr. Marroquin.

### 7. *Fraud on the Part of Juan*

The final issue which we must decide involving Juan is whether the penalty for fraud is applicable for each of the years 1963 through 1966. Sec. 6653(b). The Commissioner must

establish fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; *Blaine S. Fox,* 61 T.C. 704 (1974).

All of the Commissioner's allegations of fraud in his answer and his arguments in his brief relate to the alleged fraudulent sales price charged for the Dal-Monte tile and resulting constructive dividend to Juan from Ceramica. Since we have previously found the Commissioner's arguments on this issue to be meritless, his determination of fraud on the part of Juan must likewise be rejected.

## 8. *Residence of Roberta*

The parties have stipulated the amount of Roberta's income for the years in issue. The issue to be decided is whether she was an alien resident of the United States during the years 1960 through 1966.[6] If she was a resident alien, she is taxable on income from all sources. See sec. 1.1-1(a), Income Tax Regs. However, if she was a nonresident alien, she is taxable only on her income from sources within the United States. Sec. 872.

Residence is an elusive concept which is undefined by both the Code and the legislative history of section 872. See *Weible v. United States,* 244 F.2d 158, 163 (9th Cir. 1957). It has been frequently said that residence does not necessarily mean domicile for Federal income tax purposes. See, e.g., *Cristina de Bourbon Patino,* 13 T.C. 816, 821 (1949), affd. 186 F.2d 962 (4th Cir. 1950); *Florica Constantinescu,* 11 T.C. 37, 41 (1948); *J. P. Schumacher,* 32 B.T.A. 1242, 1247 (1935). Thus, a person may acquire a residence even though he does not intend to reside permanently and has a domicile elsewhere. See *Marsman v. Commissioner,* 205 F.2d 335, 338 (4th Cir. 1953), affg. on this issue 18 T.C. 1 (1952), cert denied 348 U.S. 943 (1955); *Ceska Cooper,* 15 T.C. 757, 763 (1950); *John Henry Chapman,* 9 T.C. 619, 622 (1947).

Both physical presence plus the definite intent to make one's home at that place is necessary to establish a residence. *William E. Adams,* 46 T.C. 352, 361 (1966). "[A] nonresident alien cannot establish a residence in the United States by intent alone

---

[6] The parties have assumed that Roberta was not a citizen of the United States during the years in issue, and we will accept that assumption as true for purposes of deciding this case. However, there is no evidence that she ever relinquished or otherwise lost her U. S. citizenship. See *United States v. Matheson,* 532 F.2d 809 (2d Cir. 1976).

since there must be an act or fact of being present, of dwelling, of making one's home in the United States for some time in order to become a resident of the United States." *Joyce de la Begassiere,* 31 T.C. 1031, 1036 (1959), affd. per curiam 272 F.2d 709 (5th Cir. 1959); see *William E. Adams, supra* at 361. Likewise, mere physical presence in a country does not by itself establish residence. *Florica Constantinescu, supra* at 43-44. However, the unexplained continued presence in a country for a prolonged period is strong evidence of an intent to make that place one's residence. *Cristina de Bourbon Patino, supra* at 821-822; see *Rudolf Jellinek,* 36 T.C. 826 (1961); cf. *Carpenter v. United States,* 495 F.2d 175 (5th Cir. 1974). The determination of residence is factual and must be made in light of all the facts and circumstances. See, e.g., *William E. Adams, supra* at 358; *Ceska Cooper, supra* at 762; *Herman Frederick Baehre,* 15 T.C. 236, 241 (1950).

Roberta relies upon section 1.871-4(b) of the regulations, which provides:

(b) *Nonresidence presumed.* An alien, by reason of his alienage, is presumed to be a nonresident alien.

However, the evidence presented by the Commissioner clearly rebuts the presumption of nonresidency. Roberta maintained and regularly lived in an apartment in Beverly Hills, Calif., for a period in excess of 20 years extending through the years in issue. Section 1.871-4(c)(2)(iii) of the regulations provides that the presumption may be rebutted by showing that the alien's stay in the United States "has been of such an extended nature as to constitute him a resident." A stay of over 20 years is obviously extended in nature. Furthermore, to argue that a person who regularly lives in an apartment for over 20 years is a mere transient or sojourner is clearly untenable. Roberta presented no evidence which tended to show that she was anything other than a resident of the United States.

although "residence" does not require a permanent home * * * or even a definite and settled abode, * * * it does require that the taxpayer have some degree of permanent attachment for the country of which he is an alien, * * * and it has been said that it is this degree of permanence of an individual's attachment for a country in which he is at some time physically present which determines whether he is a domiciliary, a resident, or a transient of that country * * * [*Rudolf Jellinek,* 36 T.C. at 834; citations omitted.]

It is clear to us that 20 years of almost continuous presence is sufficiently permanent to classify Roberta as a resident of the United States.

Roberta also argues that she was a nonresident during the years in issue since her stay was limited to a definite period by the immigration laws. She relies upon section 1.871-2(b) of the regulations, which provides in part: "An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances." However, the evidence supporting this contention is very sparse. A copy of her Mexican passport effective for some of the years in issue was offered into evidence, but the visa stamp marks on the passport were completely illegible. The only other evidence offered by Roberta consisted of two forms filed with the U.S. Immigration and Naturalization Service requesting an extension of the time of her stay in the United States. Such forms were required only for certain nonimmigrant aliens. See 8 C.F.R. sec. 214.1(a) (1967). While such evidence does tend to establish that she was not an immigrant at the time of those requests in 1965 and 1966, we do not know whether she acted properly in filing such requests, and we have no evidence as to her status in the other years in issue. Thus, she has failed to establish that she was in the United States under a temporary visa during all the years in issue.

Moreover, even if Roberta had established that her presence each year was limited by the immigration laws, we are nonetheless convinced that she was a resident of the United States during each of the years in issue. We have held on several occasions that aliens whose stay in the United States was limited by immigration laws were nevertheless residents of the United States. See, e.g., Marsman v. Commissioner, supra; Ceska Cooper, supra; Joe May, 39 B.T.A. 946 (1939); J. P. Schumacher, supra. While the facts of each of these cases may be distinguishable, such cases clearly establish that the immigration status of an alien does not conclusively determine whether she is a resident of the United States. J. P. Schumacher, 32 B.T.A. at 1247. Roberta lived in an apartment in the United States for over 20 years on an apparently permanent basis. No evidence was presented to show why she chose to reside in the United States for such an extended period. Although she was unable to testify at trial, her sons, who

did testify extensively, provided no evidence on this issue. Based on these facts, it is apparent that "exceptional circumstances" exist in this case. While Roberta's stay may have been nominally limited by the immigration laws, the fact remains that she was able to continuously reside in the United States for over 20 years.

The final issue for decision is whether the failure to file penalty should be imposed on Roberta. Section 6651(a) provides for an addition to tax for failure to file a return timely. However, the addition is not applicable if "it is shown that such failure is due to reasonable cause and not due to willful neglect." The taxpayer has the burden of proving that such failure was due to reasonable cause. *Electric & Neon, Inc.,* 56 T.C. 1324, 1342 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974); *Rudolf A. Zivnuska,* 33 T.C. 226, 239 (1959).

Although she offered no evidence on this issue, Roberta argues in her brief that her failure to file was reasonable since "common sense told her * * * she owed no United States income tax." She may have been sincere in her belief, but "Mere uninformed and unsupported belief by a taxpayer, no matter how sincere that belief may be, that he is not required to file a tax return, is insufficient to constitute reasonable cause for his failure so to file." *Robert A. Henningsen,* 26 T.C. 528, 536 (1956), affd. 243 F.2d 954 (4th Cir. 1957); see *Estate of Martha K. Campbell,* 59 T.C. 133, 139 (1972); *N.Y. State Assn. Real Est. Bd. Group Ins. Fund,* 54 T.C. 1325, 1336 (1970). There is no evidence that Roberta ever sought the advice of counsel in deciding not to file returns. Compare *Cristina de Bourbon Patino,* 13 T.C. 816, 826-827 (1949). Roberta has simply given us no evidence upon which a finding of reasonable cause could be based. See *William E. Adams,* 46 T.C. 352, 363 (1966). We hold that the penalty is applicable.

*Decisions will be entered under Rule 155.*