GARBINI ELECTRIC, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Garbini Electric, Inc. v. Commissioner
Docket Nos. 12057-77, 12058-77, 12059-77.
United States Tax Court
T.C. Memo 1982-159; 1982 Tax Ct. Memo LEXIS 589; 43 T.C.M. (CCH) 919; T.C.M. (RIA) 82159; March 29, 1982. *589 A created an electrical contracting corporation (E). J was A's assistant. A died. V, A's widow, became E's sole owner. J wanted to acquire at least half of the stock of E. V refused to part with as much as half. After two years, V and J formed a new corporation (M), to provide management services to E, for a fee of 27 percent of E's gross billings. V and J were M's only employees and the only participants in M's pension plan. Held: (1) M was a separate entity for tax purposes. (2) M's pension plan did not discriminate in favor of prohibited groups (employees who are officers, shareholders, highly compensated, or supervisory). Secs. 401(a)(3) and 401(a)(4), I.R.C. 1954. (3) Contributions by M to the pension plan are not currently includible in V's and J's incomes. (4) E and M were controlled by the same interests; respondent's allocation of income and expenses is upheld. Sec. 482, I.R.C. 1954. John F. Hopkins, for the petitioners. Milton B. Blouke, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal income taxes against the individual and corporate petitioners as follows: Docket No.
Petitioners
Year Ended
Deficiency
12057-77
Garbini Electric, Inc.
June 30, 1974
$ 23,207
12058-77
John L. Gamble and
Norma Gamble
Dec. 31, 1974
$ 2,531
12059-77
Virgie Yvonne Garbini
Dec. 31, 1974
$ 5,548
The cases have been consolidated for trial, briefs, and opinion. The issues for decision are: (1) Whether Garbini Management Company, Inc. (hereinafter sometimes referred to as "Management") was for tax purposes an entity separate from the corporate petitioner; (2) Whether *593 Management's pension plan should be treated as the pension plan of the corporate petitioner and, if so, whether the plan discriminated against rank-and-file employees; (3) Whether contributions made by Management to its pension plan on behalf of two of the individual petitioners constitute current income to them; and (4) Whether respondent's determination to allocate Management's income and expenses to the corporate petitioner under section 482[2] was unreasonable, arbitrary, or capricious, and whether the "common control" requirement of section 482 was met. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. Petitioner Garbini Electric, Inc. (hereinafter sometimes referred to as "Electric"), is a corporation formed under California law. When its petition in these cases was filed, its principal office was in Cupertino, California. When their petitions in these cases were filed--petitioners John L. Gamble (hereinafter sometimes *594 referred to as "Gamble") and Norma Gamble, husband and wife, resided in San Martin, California; and petitioner Virgie Yvonne Garbini (hereinafter sometimes referred to as "Garbini") resided in Cupertino, California. Electric was formed on December 3, 1963. It was involved in the electrical contracting business for personal homes from 1963 until about 1970. Electric then gradually switched its business to commercial work, until by about 1973, it was basically doing commercial and industrial electrical contracting. From December 3, 1963, through February 10, 1971, Arthur Garbini (hereinafter sometimes referred to as "Arthur") and Garbini were the sole shareholders of Electric and Arthur ran Electric's business. On February 10, 1971, Arthur, then 48 years old, died as a result of an airplane accident. Thereafter, and during the years 1972 through 1974, Garbini was the sole shareholder of Electric. Gamble, who is married to Garbini's sister, started his apprenticeship under Arthur at Wanderer Electric in Sunnyvale, California. Gamble went to work for Arthur when Arthur went into business for himself. Before Arthur died, Gamble supervised Electric's employees and did part *595 of the bidding. Gamble had an understanding with Arthur that eventually Gamble would become a 40-percent owner of Electric. After Arthur died, Gamble took charge of operating Electric with the help of Leroy Meek (hereinafter sometimes referred to as "Meek"), another employee of Electric. When Gamble took charge of operating Electric, the union to which he belonged required him to withdraw, and he thereby lost his rights in the union pension plan and health insurance benefits. At some time after Arthur died, Gamble began to negotiate with Garbini to buy at least a 50-percent equity interest in Electric. Gamble retained an attorney to represent him. Garbini retained another attorney to represent her in her negotiations with Gamble. Serious negotiations took place for a period of several months between Garbini and her attorney on one side and Gamble, Meek, and Gamble's attorney on the other; the attorneys prepared documents and proposed agreements during these negotiations. Negotiations came to an impasse for three reasons. First, Garbini would not sell a 50-percent or greater interest in Electric and Gamble would not accept less than a 50-percent interest. Second, Gamble did *596 not have the financial ability to offer enough money to Garbini to persuade her to sell him 50 percent of Electric. Third, Garbini was reluctant to transfer a 50-percent interest in Electric to Gamble when his capabilities in running the business had not yet been fully proven. On several occasions during this period, Gamble threatened to quit. At this point, if Gamble quit, Garbini "had no business" because Gamble was "the backbone of the business". To resolve the impasse in the negotiations, Stern Management Associates (hereinafter sometimes referred to as "Stern") was consulted. After numerous meetings and discussions, Stern recommended the formation of a management company of which Gamble would own 50 percent. On July 20, 1973, Management was formed as a California corporation. Gamble owned 50 percent of the stock of Management, Garbini owned 40 percent, and one of Garbini's two daughters owned 10 percent. On July 30, 1973, Management and Electric entered into the following management agreement: MANAGEMENT AGREEMENT GARBINI ELECTRIC INC. This agreement entered into this 30th day of July, 1973, between Garbini Electric Inc., a California corporation, hereinafter *597 referred to as Garbini Electric and Garbini Management Inc., a California corporation, hereinafter referred to as Garbini Management, do hereby agree as follows: 1. For the consideration hereafter noted Garbini Management agrees to provide to Garbini Electric, its management services consisting of but not limited to, advice and counseling regarding electrical contracting work, bidding and approving jobs, directing over-all operations of the electrical contracting business. 2. Garbini Electric agrees to provide Garbini Management with all of the information requested to complete the services referred to in paragraph 1. 3. It is understood and agreed that Garbini Management by this agreement does not assume responsibility or guarantee any of Garbini Electric's present, past, or future liabilities. Garbini Electric agrees to indemnify and save harmless Garbini Management from all liability, loss, damage, or injury arising out of or incident to Garbini Electric's electrical contracting operations completed, in process, or supplied by Garbini Electric, or any other business carried on by Garbini Electric. 4. In consideration of the services rendered pursuant to this agreement, *598 Garbini Electric agrees to pay to Garbini Management a fee as follows: Commencing August 1, 1973 the fee will be based on contract billings at the rate of 27% of gross billings. Said fees are to be computed within ten days after the close of the month and paid no later than the end of the month following the billing date. 5. Expenses related to above mentioned management services shall be absorbed by Garbini Management, except transportation costs. 6. This agreement may be terminated upon Thirty (30) days written notice by either party. On June 27, 1974, paragraph 4 of the foregoing management agreement was amended to reduce the management fee from 27 percent of gross billings to 16 percent of gross billings, beginning July 1, 1974. Management had an office, rented by Gamble, in a room in a house owned by Gamble's sister. Management's books, checkbooks, check writers, typewriters, adding machines, file cabinets, and bills were kept there. There was a built-in desk in the room, and a telephone which was the private telephone of Gamble's sister. Gamble's sister did secretarial work for Management. [3] Gamble generally spent one to three hours, two or three times a week, *599 at this office. There was, at Electric's offices, a separate office, with a desk, where Gamble also worked. [4] A secretary at Electric did typing and answered telephones for Gamble. Gamble did not inform Electric's customers that he had become a vice-president of Management. Customers of Electric could reach Gamble by calling Electric's telephone number during working hours. Management did not pay rent to Electric. Management did not advertise in the yellow pages of the telephone directory and did not have a separate telephone number. Gamble did not buy any business cards with Management's name on them. Management had stationery imprinted with its name. During the period July 20, 1973, through June 30, 1974, both Garbini and Gamble were directors of both Management and Electric. After Management was formed, Garbini and Gamble were Management's only employees, and Meek, a secretary, and field electricians were Electric's only employees. Meek *600 supervised Electric's other employees and did some bidding. Electric's union contract established a chain of command of superintendent, foreman, and journeyman. Gamble's duty as an employee of Management was to supervise Electric's shop, but he controlled directly only Meek and Electric's secretary. Garbini's duties as an employee of Management were to deal with financial matters, to provide contract advice to Gamble, and to entertain potential customers. None of the employees of Electric was involved in the affairs of Management. Both before and after Management was formed, Gamble supervised Meek and Electric's secretary. Garbini consulted with Gamble after Management was formed in the same way as she had before Management was formed. There was almost no difference between Gamble's duties before and after Management was formed. Electric entered into firm price, competitive bid, and negotiated work contracts with customers. Bidding on electrical contracting work involves mechanical work, counting items, overhead computation, and profit margin estimation. In computing a bid price, the estimator would include (1) a cost figure for parts and material, (2) a cost figure based *601 on estimated units of labor, (3) an estimate for overhead (including nonproductive labor, office expenses, fees, office help, and officers' compensation), and (4) a profit margin (normally in the range of 10 to 15 percent). The "built-in" profit margin never exceeded 15 percent. On some contracts, Electric's actual profit margin was less than 15 percent. On other contracts, a profit margin of more than 15 percent was achieved by saving labor costs, improving job layout efficiency, and bulk buying of materials. In 1970, Electric adopted a pension plan. The first contribution was made to the plan but no subsequent contributions were made. Electric filed an application for determination, dated October 9, 1972, with the District Director of the Internal Revenue Service in San Francisco, California. By letter dated March 22, 1973, Electric was informed by the District Director that the pension plan adopted in 1970 did not qualify under section 401(a). The District Director's letter indicated that, under section 1.401-3(f), Income Tax Regs., [5] consideration was given to coverage under both the employees' pension plan for the union employees and the Electric plan discussed supra. *602 The letter then noted that the Electric plan provided full vesting after 10 years of service, while the union plan provided full vesting after 20 years of service. The letter determined that this feature of the Electric plan was "clearly more favorable" than the corresponding feature of the union plan and that the participants benefitting from it "are principally those in whose favor discrimination is prohibited by Internal Revenue Code Section 401(a)(4)". The letter then concluded that the Electric plan was not qualified because it violated section 401(a)(4). *603 On April 23, 1974, Management adopted a pension plan (hereinafter sometimes referred to as "the Plan"); it filed an application for determination that the Plan was a qualified plan under section 401(a) and that the trust under the Plan was exempt under section 501(a). By a form letter dated May 15, 1974, the District Director informed Management that respondent made a favorable determination as to the Plan, but that continued qualification of the Plan would depend on its operation. The Plan provided for full and immediate vesting of the interests of all participants. At the time of the application for determination, Garbini and Gamble were the only participants in, and the only trustees of, the Plan. When Stern was consulted with respect to the Garbini-Gamble negotiations, Stern brought in an accountant to assist in the process, particularly as to tax and accounting matters. The accountant explained to Garbini and Gamble the tax consequences of establishing a separate corporation to provide management services, including the benefits of a surtax exemption. The accountant also briefly discussed the concept of a pension plan for Management. Management's establishment and the *604 Plan's adoption resulted from this process, although a separate firm assisted in the adoption and qualification of the Plan. Electric reported gross receipts, officers' and directors' compensation, and taxable income for its fiscal years ending June 30, 1973, and June 30, 1974, in the amounts set forth in table 1. Table 1 Fiscal Year Ending
June 30, 1973
June 30, 1974
Gross Receipts
$ 682,460
$ 668,259
Compensation
Garbini
58,000
4,040
Gamble
44,553
4,709
Meek
37,368
32,624
Total
$139,921
$ 41,373
Taxable Income
$ 22,779
$ 32,933
During the period July 20, 1973, through June 30, 1974, Electric paid $ 149,974, designated as management fees, to Management. Management's expenses for this period totaled $ 101,626. These expenses include officers' compensation as shown in table 2. Table 2 Garbini
Gamble
Direct compensation--short fiscal
year ending April 30, 1974
$ 32,250
$ 31,420
Direct compensation--May 1, 1974
through June 30, 1974
6,400
6,400
Contribution to the Plan
8,645
6,402
$ 47,295
$ 44,222
In 1976, Electric was dissolved, Gamble bought half of the assets, and Garbini and *605 Gamble formed a partnership to operate the business. Management's creation was an interim solution to break the impasse arising from Garbini's and Gamble's dispute over control of Electric. Management was formed in order to provide Gamble with enough assets to buy 50 percent of Garbini's interest in Electric. During Electric's fiscal year here in issue, Management and Electric were separate taxable entities and both o these corporations were controlled by Garbini and Gamble together. Respondent disallowed Electric's deduction of $ 149,974 for management fees, but allowed Electric to deduct all of Management's expenses during Electric's fiscal year here in issue, in the amount of $ 101,626. OPINION I. Validity of Management
Respondent argues that Management was a sham corporation which was not a viable separate entity engaged in carrying on business activities separate and distinct from Electric. Accordingly, respondent urges that Electric not be allowed to deduct the fees it paid to Management, but that Electric should be allowed to deduct all of Management's expenses. [6] Petitioners maintain that Management and Electric were separate taxable entities. *606 We agree with petitioners. We believe that our recent opinions in Keller v. Commissioner,77 T.C. 1014 (1981), and Achiro v. Commissioner,77 T.C. 881 (1981), lead to the conclusion that Management's separate existence should be recognized for income tax purposes. Gamble was a 50-percent shareholder in Management, but owned no stock in Electric. Indeed, Gamble's lack of ownership in Electric was the bone of contention that led ultimately to Management's creation. Management had employees (Garbini and Gamble) who performed services. Management's business was to perform management services for Electric; it performed these services through its employees. Management entered into a management contract with Electric and respondent does not suggest that the two corporations failed to fulfill their obligations under this contract. Management had its own books and records; it kept them in an office separate from Electric. Factors pointing toward a lack of bustance to Management's separate status are the following: the practical operation of Electric's business did not change after Management's incorporation; Management did not have an advertised *607 office or a telephone number; Electric's customers were not told of Gamble's change in employment status; Gamble normally worked in, and out of, Electric's office and not Management's office; and Management did not solicit customers for its services and served only Electric. On balance, Management has a stronger case under section 61(a) than the taxpayers in whose favor we ruled on this issue in Keller and Achiro.
On this issue, we hold for petitioners. II. Tax-Qualified Status of the Plan
Respondent maintains that "[b]ecause * * * Management should be disregarded for tax purposes, the pension plan established by * * * Management should be the plan of * * * Electric. As such, the plan in operation discriminates against the lower-paid employees of * * * Electric." Respondent relies on the breadth-of-coverage and discrimination provisions of paragraphs (3) and (4) of section 401(a). [7] Petitioners argue that the Plan benefited all of Management's employees, thus meeting the statutory requirements, and that respondent "has not made any argument that the plan should be disallowed if * * * Management is recognized as a viable entity." *608 We agree with petitioners that the Plan did not discriminate against lower-paid employees during the year in issue. We have decided that the corporate existence of Management should not be ignored for tax purposes. We see no basis for treating the employees of Electric as employees of Management. We conclude that the Plan--under which all of Management's employees were eligible to and did benefit--did not discriminate against lower-paid employees, and that the Plan should not be treated as Electric's pension plan. Respondent had adduced no other reason for disqualifying the Plan under section 401 and so we conclude that, for the period before the Court, the Plan is qualified. On this issue, we hold for petitioners. III. Additional Compensation Income
Respondent argues that the amounts contributed to the Plan on behalf of Garbini and Gamble are income to them because, he asserts, the nonqualified status of the Plan causes it not to be exempt from taxation under section 501. Respondent relies on a constructive receipt theory; he makes no mention of section 402(b). Petitioners do not directly address this argument but continue to maintain that the Plan is qualified. *609 We agree with petitioners' conclusion. Garbini and Gamble were participants in the Plan--a tax-qualified employees' plan. As such, they are not required to take into income their employer's contributions under the Plan until these contributions are distributed or made available to them. Sec. 1.402(a)-1(a)(1)(i), Income Tax Regs.
Apart from his argument based on the idea that the Plan is not qualified, [8] respondent does not suggest that Management's contributions to the Plan were distributed or made available to Garbini or Gamble in 1974. We conclude that Management's contributions to the Plan are not includible in Garbini's and Gamble's incomes for 1974. On this issue, we hold for petitioners.
IV. Section 482 Adjustment
Respondent maintains that, if we conclude that Management was a separate and viable entity for tax purposes, then the income and expenses *610 of Management should be reallocated to Electric under section 482.Respondent argues that both Management and Electric were controlled directly by Garbini or, alternatively, that Garbini and Gamble can be considered the "same interests" for purposes of section 482. In addition, respondent maintains that the allocation is necessary in order to prevent evasion of taxes. Petitioners argue that the "common control" requirement of section 482 was not met and that the proposed reallocation is not necessary to prevent evasion of taxes or clearly reflect income. We agree with respondent's conclusions.
Section 482[9] provides in relevant part that, in the case of two corporations owned or controlled directly or indirectly by the same interests, the Secretary may allocate gross income and deductions between them if he determines that the allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of the corporations. Petitioners prevail on this issue if they carry their burden of proving either (1) that there is no common control, or (2) that respondent was unreasonable, arbitrary, or capricious in his determination that the allocation he made is necessary *611 in order to prevent evasion of taxes or clearly to reflect income. We examine first the question of evasion or clear reflection of income, and then the question of common control. A. Evasion or Clear Reflection of Income
Respondent's determinations as to section 482 allocations are to be set aside only *612 if "unreasonable, arbitrary, or capricious". Your Host, Inc. v. Commissioner,489 F.2d 957, 960 (CA2 1973), affg. 58 T.C. 10, 23 (1972); Grenada Industries, Inc. v. Commissioner,17 T.C. 231, 255 (1951), affd. 202 F.2d 873 (CA5 1953). The standard to be applied is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. See sec. 1.482-1(b)(1), Income Tax Regs.
The only evidence as to how Electric and Management set the 27-percent management fee is Garbini's testimony that "you're just wildly guessing. You hope you're getting close, but you don't know. So, they had guessed that 27 percent was all right * * *." Garbini and Gamble testified that cash flow and capital problems for Electric caused the rate to be reduced to 16 percent as of July 1, 1974. No consideration appears to have been given to what an unrelated management company would be paid for its services. For the relevant period, Electric paid $ 149,974 as management fees, of which respondent allowed $ 101,626. If $ 149,974 represented the payments required by the management contract at the 27-percent rate, then it appears *613 that respondent's $ 101,626 allowance is more than an 18-percent rate--higher than the 16-percent rate Electric and Management contracted for as of July 1, 1974. Under the circumstances, we are not persuaded that respondent's allocation was unreasonable, arbitrary, or capricious. More specifically, we are not persuaded that respondent erred in determining that net disallowance of so much of Electric's management fee deduction as exceeded $ 101,626 is necessary in order clearly to reflect Electric's income. The management fee in excess of the $ 101,626 was a shift of income from Electric to Management, resulting in $ 25,000 of the excess being exempt from the then-applicable corporate surtax rate of 26 percent. We are not persuaded that respondent erred in determining that the disallowance is necessary in order to prevent evasion of taxes. Accordingly, petitioners have failed to carry their burden of proof on the question of evasion or clear reflection of income. B. Common Control
Clearly, Garbini was in sole control of Electric; she owned all of its stock and was one of its directors. Just as clearly, she was not in sole control of Management, even if we assume she *614 controlled her daughter's 10-percent share of Management's stock. Gamble owned half of Management's stock, was active in its operations, and negotiated loud and long to achieve at least that much of a voice. Gamble had half the ownership and control of Management. Thus, we conclude that neither Garbini, by herself, nor Gamble, by himself, controlled both of the corporations. However, respondent relies on Brittingham v. Commissioner,66 T.C. 373 (1976), affd. 598 F.2d 1375 (CA5 1979), to support his view that Garbini and Gamble should be treated as "the same interests," within the meaning of section 482. Petitioners rely on the same case for their view of the application of the law to the facts. In Brittingham, we described the test as follows (66 T.C. at 397-398): Different persons with a common goal or purpose for artificially shifting income can constitute the "same interests" for the purposes of the statute. [Citation omitted.] Thus, it is not necessary that the same person or persons own or control each controlled business before section 482 can be applied, but there must be a common design for the shifting of income *615 in order for different individuals to constitute the "same interests." * * * Garbini and Gamble were closely related by marriage, had known each other for a long time, and worked together. As is made clear in Brittingham, such affinity is not enough for them to constitute "the same interests", within the meaning of section 482. For that, there must be "a common design for the shifting of income". In the instant cases the common design appears in Garbini's and Gamble's testimony that Management was formed in order to provide Gamble with enough assets to buy 50 percent of Garbini's interest in Electric. The only source of Management's receipts, on the record in the instant cases, is the management fees which Electric deducted. The record does not show that Management provided any management services (or any other service, or any product) to ayone else. No steps were taken to indicate to others that Management was available to provide services to anyone else. From the foregoing, we conclude the common design of Garbini and Gamble was a design to shift income from Electric to Management. Petitioners contend that a shifting of income from Electric to Management was *616 contrary to Garbini's interest because "each dollar paid by Garbini Electric resulted in a loss of $ .60 to Mrs. Garbini." [10] We note that this surface conflict to which petitioners point ignores the role that Management played in (1) providing another $ 25,000 exemption from the 26-percent corporate surtax rate then in effect and (2) permitting Garbini to benefit from tax-favored deferred compensation. As a result of the additional surtax exemption, although Garbini had to share with Gamble any income shifted to Management, the shift of income to Management meant that there was more after-tax income to share. Garbini had a smaller percentage, but it was a percentage of a bigger pie. Also, Management's establishment of the Plan enabled Garbini to avoid the problem that had led respondent to refuse to issue a favorable determination letter as to Electric's plan. Electric's plan had been turned down because its 10-year vesting provision, *617 for the benefit of the "prohibited group", [11] was more generous than the 20-year vesting provision for the union plan. Since Management apparently is a separate employer, it does not appear to be necessary to take into account the union plan for Electric's employees in applying the antidiscrimination tests to the Plan. (See issues I and II, supra.) As a result, the Plan is permitted to provide full and immediate vesting to Garbini--a far more generous provision than the 10-year rule that respondent had previously refused to sanction. When we take into account the effect of the surtax exemption and the Plan, we cannot agree with petitioners' contention that a shifting of income from Electric to Management was contrary to Garbini's interest.
We are left, then, with the conclusion that Garbini and Gamble shared "a common design for the shifting of income", within the concepts described in Brittingham.
From the foregoing, we conclude that Garbini and Gamble *618 constituted "the same interests" and that Electric and Management were "owned or controlled directly or indirectly by the same interests," within the meaning of section 482. On this issue, we hold for respondent. In accordance with the foregoing, Decision will be entered for the respondent in docket No. 12057-77.
Decisions will be entered for the petitioners in docket Nos. 12058-77 and 12059-77.
Footnotes
1. Cases of the following petitioners are consolidated herewith: John L. Gamble and Norma Gamble, docket No. 12058-77; and Virgie Yvonne Garbini, docket No. 12059-77.↩
2. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩
3. Nothing in the record indicates that Gamble's sister was compensated for this work, or in any other respect was an employee of Management.↩
4. Gamble also spent time away from both offices, negotiating contracts.↩
5. (f) An employer may designate several trusts or a trust or trusts and an annuity plan or plans as constituting one plan which is intended to qualify under section 401(a)(3), in which case all of such trusts and plans taken as a whole may meet the requirements of such section. The fact that such combination of trusts and plans fails to qualify as one plan does not prevent such of the trusts and plans as qualify from meeting the requirements of section 401(a). This regulation is in accord with the lead-in language of section 401(a)(3)↩, as then in effect. See the lead-in language of section 410(b)(1), of present law.
6. Respondent does not tell us what part of the Internal Revenue Code of 1954 is to apply; he specifically denies reliance on section 269. We assume section 61(a) is the basic provision under respondent's approach. See, e.g., Keller v. Commissioner,77 T.C. 1014, 1021 (1981); Achiro v. Commissioner,77 T.C. 881, 901-903 (1981); see also Foglesong v. Commissioner,77 T.C. 1102↩ (1981).
7. The breadth-of-coverage provisions were revised and moved to section 410(b) by sections 1011 and 1016(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. 93-406, 88 Stat. 829, 898, 929. Neither the breadth-of-coverage amendments nor the antidiscrimination amendments in ERISA affect the instant cases.↩
8. Neither of the cases cited by respondent ( Jacuzzi v. Commissioner,61 T.C. 262 (1973), and Sproull v. Commissioner,16 T.C. 244 (1951), affd. 194 F.2d 541 (CA6 1952)) presented the treatment of contributions under plans qualified under section 401↩.
9. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. [The subsequent amendment of this provision by section 1906(b)(13) [sic](A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1834, does not affect the instant cases.]↩
10. Petitioners assert on brief and assume for this argument the independence of the daughter who owned 10 percent of Management. The only evidence in the record on this point is that this owner is one of Garbini's two daughters.↩
11. Under section 401(a)(4)↩, this consisted of "employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, [and] highly compensated employees."